NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-5189

────────────────────

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

────────────────────

EL PUENTE DE WILLIAMSBURG, et al.,
*Plaintiffs/Appellants*,

v.

U.S. ARMY CORPS OF ENGINEERS, et al.,
*Defendants/Appellees*.

────────────────────

Appeal from the United States District Court for the District of Columbia
No. 1:22-cv-02430-CJN (Hon. Carl J. Nichols)

────────────────────

**BRIEF FOR APPELLEES**

────────────────────

Of Counsel:

RACHEL D. GRAY
*Senior Civil Works Attorney*
U.S. ARMY CORPS OF ENGINEERS

KATHARINE M. ZAMBONI
*Attorney*
NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION

TODD KIM
*Assistant Attorney General*
RACHEL HERON
MICHELLE M. SPATZ
CHRISTOPHER C. HAIR
KEVIN W. McARDLE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
Tele:  (202) 305-0219
kevin.mcardle@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Plaintiffs/Appellants.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Brief for Plaintiffs/Appellants.

**C.    Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Kevin W. McArdle*
KEVIN W. McARDLE

Counsel for Defendants/Appellees

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ....................................................................................................i

TABLE OF AUTHORITIES ......................................................................v

GLOSSARY.............................................................................................ix

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF THE ISSUES..............................................................3

PERTINENT STATUTES AND REGULATIONS ..................................4

STATEMENT OF THE CASE..................................................................4

    A.    Statutory and regulatory background ...................................4

        1.    The Endangered Species Act ....................................4

        2.    The National Environmental Policy Act....................5

    B.    Factual background ...............................................................6

        1.    The Project ................................................................6

        2.    Economic analysis.....................................................7

        3.    Analysis of potential environmental impacts ...........11

            a.    Threatened corals...........................................11

            b.    Communities with environmental justice
                concerns ........................................................14

            c.    Cumulative impacts .......................................16

4.  Supplemental environmental analyses and the New Fortress Energy facility ............................................... 16

C.  Proceedings below ................................................................ 19

SUMMARY OF ARGUMENT .............................................................. 20

STANDARD OF REVIEW .................................................................. 22

ARGUMENT ...................................................................................... 23

I.  Plaintiffs' segmentation claims are forfeited and lack merit in any event. ................................................................................ 23

A.  Plaintiffs forfeited their segmentation arguments. .............. 24

B.  Plaintiffs' segmentation arguments lack merit.................... 25

1.  The Authority's contemplated LNG terminal is not a connected action. ................................................... 26

2.  The Authority's contemplated LNG terminal is not a cumulative action. .................................................. 31

3.  The potential future construction of the contemplated LNG terminal is not an indirect effect of the Project. ................................................. 32

II.  The Corps' cumulative impact analysis complied with NEPA. .................... 34

III.  The Corps' environmental justice analysis complied with NEPA. ........................................................................................ 37

IV.  The agencies' analyses of potential impacts on corals complied with NEPA and the ESA. ............................................................. 41

A.  The baseline data considered by the Corps allowed for informed decision-making ...................................................... 41

B.  The agencies reasonably accounted for the distinct Port of Miami project. ...................................................................... 42

C.    The agencies properly relied on enhanced monitoring to
ensure that listed corals are not adversely affected............................45

D.    The record supports the Service's conclusion that the
Project is not likely to adversely affect listed corals...........................47

CONCLUSION ................................................................................................49

CERTIFICATE OF COMPLIANCE ......................................................................51

ADDENDUM ................................................................................................52

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. Nuclear Regulatory Commission*,
  988 F.2d 146 (D.C. Cir. 1993) .............................................................50

*Better Government Association v. Department of State*,
  780 F.2d 86 (D.C. Cir. 1986) .............................................................38

*Calcutt v. FDIC*,
  598 U.S. 623 (2023) ................................................................ 39, 41, 42

*Center for Biological Diversity v. Bureau of Land Management*,
  698 F.3d 1101 (9th Cir. 2012) ............................................................47

*Center for Biological Diversity v. FERC*,
  67 F.4th 1176 (D.C. Cir. 2023) ................................................... 28, 33

*Center for Sustainable Economy v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015) .................................................... 24, 25

*City of Boston Delegation v. FERC*,
  897 F.3d 241 (D.C. Cir. 2018) ............................... 5, 28, 29, 31, 36

*Colorado Environmental Coalition v. Dombeck*,
  185 F.3d 1162 (10th Cir. 1999) .........................................................42

*Defenders of Wildlife v. Department of Navy*,
  733 F.3d 1106 (11th Cir. 2013) .........................................................43

*Defenders of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017) .........................................................49

*Delaware Riverkeeper Network v. FERC*,
  753 F.3d 1304 (D.C. Cir. 2014) .........................................................23

*Department of Transportation v. Public Citizen*,
  541 U.S. 752 (2004) .................................................................... 24, 33

*Eagle County v. Surface Transportation Board*,
   82 F.4th 1152 (D.C. Cir. 2023) ............................................................33

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002) ...........................................................22

*Great Basin Mine Watch v. Hankins*,
   456 F.3d 955 (9th Cir. 2006) .............................................................30

*Greater Yellowstone Coalition v. Flowers*,
   359 F.3d 1257 (10th Cir. 2004) ..........................................................46

*Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
   702 F.3d 1156 (10th Cir. 2012) ..........................................................47

*Hudson River Sloop Clearwater v. Department of Navy*,
   836 F.2d 760 (2d Cir. 1988)..............................................................30

*IMS, P.C. v. Alvarez*,
   129 F.3d 618 (D.C. Cir. 1997) ...........................................................45

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976)......................................................................27

*Miller v. Lehman*,
   801 F.2d 492 (D.C. Cir. 1986) ...........................................................43

*Minisink Residents for Envtl. Pres. and Safety v. FERC*,
   762 F.3d 97 (D.C. Cir. 2014) .................................................. 28, 32, 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)............................................................... 23, 49

*National Association of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007)......................................................................48

*National Wildlife Federation v. FERC*,
   912 F.2d 1471 (D.C. Cir. 1990) ........................................ 26, 27, 28, 29, 31, 34

*New Fortress Energy Inc. v. FERC*,
    36 F.4th 1172 (D.C. Cir. 2022) ................................................... 18, 29

*New Fortress Energy LLC*,
    174 FERC ¶ 61207 .......................................................................18

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) .....................................................18

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016) ........................................ 24, 33, 46, 48

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ...................................................37

*Sierra Club v. U.S. Army Corps of Engineers*,
    803 F.3d 31 (D.C. Cir. 2015) ................................................. 27, 36

*Sierra Club v. Watkins*,
    808 F. Supp. 852 (D.D.C. 1991) ...................................................38

*Theodore Roosevelt Conservation Partnership v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ................................................ 5, 31, 48

*TOMAC v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) .....................................................37

*Village of Bensenville v. FAA*,
    457 F.3d 52 (D.C. Cir. 2006) .......................................................23

**Federal Statutes**

5 U.S.C. § 706 ................................................................... 22, 43

16 U.S.C. § 1536 ....................................................................4

16 U.S.C. § 1540(g) ...............................................................18

42 U.S.C. § 4332 ................................................................ 5, 26

**Regulations**

40 C.F.R. § 1500.1(b) ..............................................................35

40 C.F.R. § 1502.9(c) ..............................................................39

40 C.F.R. § 1508.23 ................................................................26

40 C.F.R. § 1508.25(a) ............................................................31

40 C.F.R. § 1508.8(b) ......................................................... 32, 37

40 C.F.R. § 1508.9(a) ................................................................5

50 C.F.R. § 222.101(a) ..............................................................4

50 C.F.R. § 402.13 ............................................................. 4, 48

50 C.F.R. § 402.16(a)................................................... 19, 20, 45

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FERC | Federal Energy Regulatory Commission |
| LNG | Liquified natural gas |
| NEPA | National Environmental Policy Act |

## INTRODUCTION

In 2018, the U.S. Army Corps of Engineers (Corps) approved important navigational improvements in San Juan Harbor to facilitate the safe and efficient movement of commerce, including large petroleum tankers, container ships, and cruise ships. The project involves dredging existing shipping channels within the harbor. During its development, the Puerto Rico Electric Power Authority (Authority) informed the Corps that it planned to seek authorization from the Federal Energy Regulatory Commission (FERC) to build a liquified natural gas (LNG) terminal that would benefit from the dredging because the deeper shipping channels would allow large LNG tankers to access the terminal. But the Corps found it uncertain whether the Authority would pursue its LNG plans and determined that the project was justified regardless. To the best of our knowledge, the Authority still has not sought FERC's authorization to construct the dredging-dependent LNG terminal it contemplated in 2018.

Plaintiffs sued the Corps in 2022, alleging that the agency violated the National Environmental Policy Act (NEPA) by impermissibly segmenting NEPA review of the navigational improvements and the Authority's contemplated LNG terminal, and by failing to adequately analyze the environmental impacts of the navigational improvements. Plaintiffs also sued the National Marine Fisheries Service (Service) and alleged that both agencies violated the Endangered Species

1

Act (ESA) by arbitrarily concluding that the improvements are unlikely to harm threatened corals or their critical habitat.

The district court properly rejected Plaintiffs' claims. Plaintiffs forfeited their segmentation arguments, which lack merit in any event. The Corps did not segment NEPA review of the navigational improvements and the LNG terminal envisioned by the Authority in 2018 because the Corps was not proposing to approve the terminal; the Authority had not submitted any proposal to FERC; it was uncertain if a proposal would be submitted; and the Corps reasonably determined that the navigational improvements were justified regardless of the Authority's LNG plans. Because the project's adverse effects are largely limited to minor water quality impacts near the dredging areas, the Corps also reasonably concluded that the project will not contribute to cumulatively significant impacts or cause disproportionate harm to communities with environmental justice concerns. And the Service and the Corps reasonably concluded after interagency consultation that the project is not likely to harm threatened corals or their critical habitat.

The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

(A)    The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under NEPA, 42 U.S.C. §§ 4321 et seq.,

2

the ESA, 16 U.S.C. §§ 1531 et seq., and the Administrative Procedure Act (APA),

5 U.S.C. §§ 701 et seq.  [ECF.1].

(B)    This Court has jurisdiction under 28 U.S.C. § 1291 because the

district court entered a final judgment.  [ECF.33].

(C)    That judgment was entered on July 24, 2023.  *Id.*  Plaintiffs appealed

on August 21, or 28 days later.  [ECF.36].  The appeal is timely.  *See* Fed. R. App.

P. 4(a)(1)(B).

(D)    The appeal is from a final judgment that disposes of all claims.

## STATEMENT OF THE ISSUES

1.    Whether the Corps improperly segmented NEPA review of the

navigational improvements in San Juan Harbor and the LNG terminal envisioned

by the Authority in 2018.

2.    Whether the Corps adequately analyzed the potential cumulative

impacts of the navigational improvements.

3.    Whether the Corps adequately analyzed the potential impacts of the

navigational improvements on communities with environmental justice concerns.

4.    Whether the agencies' analyses of the navigational improvements'

potential effects on threatened corals and their critical habitat satisfied the

agencies' ESA responsibilities and the Corps' NEPA duties.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations not included in the Addendum to Plaintiffs' Opening Brief are set forth in the attached Addendum.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

### 1.    The Endangered Species Act

The ESA provides for the listing of species as threatened and endangered and for the designation of critical habitat for listed species.  *See* 16 U.S.C. § 1533. The Secretary of the Interior and the Secretary of Commerce share responsibility for administering the ESA.  The Secretary of Commerce is generally responsible for listed marine species, including the listed corals at issue, and discharges that responsibility through the Service.  *See* 50 C.F.R. § 222.101(a).

Section 7 of the ESA directs each federal agency, in consultation with the Service, to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence" of listed species or destroy or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2).  If, during initial informal consultation, the action agency determines, with the Service's written concurrence, that the proposed action is "not likely to adversely affect" listed species or critical habitat, "the consultation process is terminated, and no further action is necessary."  50 C.F.R. § 402.13(c).  However, "[r]einitiation of

consultation is required and shall be requested by the [action] agency or by the Service" in certain circumstances, including when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." *Id*. § 402.16(a)(2).

## 2.    The National Environmental Policy Act

"NEPA establishes an environmental review process under which federal agencies identify the reasonable alternatives to a contemplated action and look hard at the environmental effects of their decisions." *City of Boston Delegation v. FERC*, 897 F.3d 241, 246 (D.C. Cir. 2018) (cleaned up).  NEPA directs each agency to prepare a detailed "environmental impact statement" (EIS) for any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  If it is unclear whether an action will have significant impacts, "agencies may prepare an environmental assessment." *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010).  An environmental assessment is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact."  40 C.F.R. § 1508.9(a)(1).[1]

_____

[1] NEPA regulations, which are promulgated by the Council on Environmental Quality (the executive body charged with interpreting NEPA), were amended effective September 14, 2020.  85 Fed. Reg. 43,304 (July 16, 2020).  This brief refers to the pre-2020 version of regulations in effect in when the Corps prepared its environmental assessment.  NEPA also was recently amended by the Fiscal

An agency must also supplement its NEPA analysis in certain circumstances, including when it "makes substantial changes in the proposed action that are relevant to environmental concerns." *Id*. § 1502.9(c)(1).

### B.    Factual background

### 1.    The Project

Navigational constraints in San Juan Harbor hinder the safe and efficient movement of commerce.  Large vessels, including petroleum tankers, container ships, and cruise ships, "are constrained by insufficient channel depths and under-sized turning areas and all vessels can be constrained by strong or unpredictable winds and currents or other conditions that affect operational maneuverability." [USACE_110-11]; *see also* [USACE_33, 52].  The Corps is responsible for providing safe, reliable, efficient, and environmentally sustainable waterborne transportation for the movement of commerce.  [USACE_32].  In 2006, the U.S. House of Representatives authorized the Corps to determine the feasibility of making navigation improvements in San Juan Harbor to increase security, safety, and efficiency.  [USACE_32, 54].  Using NEPA's procedural framework, the Corps developed the San Juan Harbor Navigation Improvements Project (Project).

The Corps initially announced its intent to prepare an EIS for the Project, [USACE_201, 7577], but decided after public scoping to prepare an environmental

---

Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023), but the amendments are not germane to this dispute.

assessment, [USACE_202].  The Corps released a draft for public comment in August 2017 and conducted a public meeting.  [USACE_202, 2458-2508, 2559-2789].  In August 2018, the Corps released its final environmental assessment describing the recommended Project.  [USACE_28-217].

The Project's central component involves deepening certain shipping channels in San Juan Harbor, extending one channel, and widening another channel and turning basin.  [USACE_30, 34, 135-37].  The associated dredging will take place entirely within the harbor, beginning with the innermost segment of the entrance channel (Cut 6).  [USACE_135, 1712].  The Corps estimated that the dredging would take 12 months to complete.  [USACE_165].

Scows (barges) will transport dredged material to a disposal site two miles offshore that has been used for disposal of dredged material since 1975.  [USACE_34, 67, 141].  EPA manages the site under a plan that requires monitoring and other measures to control leakage of dredged material during transport.  [USACE_67, 91, 167, 177-78, 3468-70].

### 2. Economic analysis

The Corps conducted an economic analysis of the Project to determine whether federal cost-sharing was justified, which depends on the Project's expected return to the national economy.  [USACE_33, 55].  As with most Corps navigational improvements, the Project's expected return stems from reduced

waterborne transportation costs.  [USACE_55].  But the Corps also determined that the Project could help Puerto Rico realize an economic benefit in the form of reduced power generation costs.  *Id*.

The Authority owns two powerplants in the area:  the San Juan plant on the south side of the harbor and the nearby Palo Seco plant.  [USACE_8033].  To reduce costs and comply with EPA air quality standards, the Authority planned to modify both plants to burn natural gas.  *Id*.  Absent the modification, the Authority would have to increase its use of diesel fuel at both plants.  [USACE_1280].

The Authority retained a consulting firm to study the feasibility of LNG delivery options.  [USACE_831, 8031-62].  In 2015, the firm recommended Option 14, an LNG terminal adjacent to the Authority's San Juan powerplant. [USACE_8056].  Because Option 14 "relies on a standard scale LNG carrier delivering directly to on land tanks," it would require dredging the approach channel in the harbor, which is presently too shallow to accommodate standard LNG tankers.  [USACE_831, 8053, 8055-56].  Option 14 also required FERC's review and approval under the Natural Gas Act.  [USCE_1278, 8042].

The Authority conveyed its intent to pursue Option 14 to the Corps, underscoring that the envisioned LNG terminal would require dredging the approach channel in the harbor.  [USACE_1170, 6511-20].  However, as of November 2017, after the close of the comment period on the Corps' draft

8

environmental assessment, the Authority had not yet applied to FERC for authorization to proceed with the project.  [USACE_1725].

In January 2018, the Authority sent a letter to the Corps reiterating its intent to pursue construction of the envisioned LNG terminal.  [USACE_1278-81].  The Authority indicated that the terminal would cost $350 million and require a private partner (who had not yet been selected).  *Id*.  Studies in support of the FERC application process would begin in April 2018, the Authority stated, with a May 2018 target date for "[c]onceptual design."  [USACE_1280].  The Authority estimated that FERC approval would take up to three years from the submission of a proposal and that construction could take an additional three years after FERC approval.  [USACE_1278].  The Authority anticipated that the contemplated LNG terminal would be operational by 2024 or 2025.  *Id*.

The Corps was skeptical of the proposed timeline and the Authority's ability to move forward with its LNG plans at all.  The Corps concluded in its final environmental assessment that Puerto Rico's transition to the use of LNG for power generation "seems … a reasonable future assumption" based on the Authority's intentions, the relatively low price of LNG, and the widespread use of LNG for power generation.  [USACE_151].  But the Corps determined that there was "a climate of uncertainty surrounding if and when the LNG investment and conversion will occur."  *Id*.  The Corps explained that the Authority was still

addressing the damage caused by hurricanes Irma and Maria, which struck Puerto Rico in September 2017; the Authority had recently filed for bankruptcy, calling into question how the $350 million project would be funded; and Puerto Rico's Governor had recently announced plans to privatize the Authority, creating uncertainty as to who would be responsible for decisions relating to Puerto Rico's power generation.  [USACE_138, 151, 875].

Given the uncertainty, the Corps prepared two alternative economic analyses for the Project.  The first assumed that the Authority would construct its contemplated LNG terminal, and the second assumed that the Authority would not proceed with its LNG plans.  [USACE_34-35, 148-49, 151-52, 831].  The Corps concluded that the Project was economically justified under either scenario.  [USACE_151-52].  Even though Puerto Rico would not realize reduced power generation costs in the without-LNG scenario, the transportation cost savings ($4.3 million) would be greater than the with-LNG scenario because the operating costs of LNG vessels exceed those of petroleum tankers.  [USACE_37, 145-46, 153].  The Corps thus determined that whether the Authority proceeded with its LNG plans was a "relatively low consequence item to the Federal government from a plan selection perspective."  [USACE_875]; *see also* [USACE_151].

### 3.    Analysis of potential environmental impacts

The Corps also analyzed the Project's potential environmental impacts under NEPA, concurrently completing ESA consultation with the Service.  The Corps ultimately concluded that the Project would cause only "minor adverse impacts to water quality in the areas near the dredging activities," [USACE_38], and that an EIS was not required, [USACE_3].  Congress authorized the Project in 2018, Pub. L. No. 115-270, § 1401(1), 132 Stat. 3765, 3836, and the Corps issued its final approval in November 2018, [USACE_1-3].  Relevant aspects of the agencies' supporting environmental analyses are discussed below.

### a.    Threatened corals

In 2017, the Corps prepared a biological assessment of the Project and submitted it to the Service.  The assessment concluded that the Project was not likely to adversely affect threatened corals or their critical habitat and requested the Service's concurrence under ESA Section 7.  [USACE_3450, 3502-33].

The Corps explained that no listed corals had been detected in the harbor during prior surveys, [USACE_3502-05], and that the nearest coral critical habitat was located 2,500 feet from the closest dredging area (Cut 6).  [USACE_3485, 3508-10].  The Corps nevertheless recognized that the Project may indirectly affect listed corals or critical habitat by increasing turbidity and sediment deposition and through leakage of dredged material during transport.  [USACE_3505-06, 3510].

11

But the Corps concluded that adverse indirect effects were unlikely because turbidity and sediment deposition would be temporary and limited to the corridors adjacent to dredged areas, where no listed corals are located.  [USACE_3506-09].

The Corps based that conclusion on four comparable past projects which did not cause any documented adverse effects.  [USACE_176-77, 3511-12].  The Corps also noted that monitoring reports from a recent Miami dredging project indicated that the potential for adverse effects is greatest when corals are directly adjacent to the dredged areas.  [USACE_3508].  And the Corps explained that the Project requires monitoring to ensure that turbidity does not exceed Puerto Rico's water quality standard of 10 Nephelometric Turbidity Units above background, *id*. as well as monitoring of scows to prevent excessive leakage of dredged material during transport, [USACE_3469-70, 3512, 3551-52, 3559, 3564].

The Service questioned certain aspects of the Corps' analysis and requested additional information.  [NMFS_169-76].  In particular, the Service questioned the Corps' reliance on monitoring data from the Miami project, citing a 2016 study indicating that the Miami project's adverse effects extended more than 700 feet from the dredged channel.  [NMFS_172-73, 789-847].

The agencies met to discuss the Service's concerns, [USACE_1703-20], including the need to incorporate lessons learned from the Miami project while "understanding differences" between the two projects, [USACE_1712].  The Corps

also provided additional information, including monitoring data from two prior maintenance dredging projects in San Juan Harbor that showed only minor increases in turbidity.  [USACE_1647-1702].  Ultimately, the Service stated that it needed assurances that there would be no high turbidity or sedimentation in the reef areas near the harbor entrance or in critical habitat adjacent to the scow transport routes.  [USACE_1716].  In response, the Corps agreed to implement an enhanced monitoring plan meeting three key requirements.  [NMFS_11-12].

First, monitoring stations must be placed adjacent to any listed corals found during pre-construction surveys and at the edges of designated critical habitat along the scow transit route.  *Id*.  The exact number and location of monitoring stations would be specified in the final plan developed in coordination with the Service.  [NMFS_11].  Second, turbidity must not exceed 7 Turbidity Units above background at any monitoring station.  *Id*.  That conservative threshold is based on a recent study "recommending a reduction of US-EPA allowable turbidity from 29 [Turbidity Units] above background to <7 [Turbidity Units] near coral reefs." [NMFS_691, 693].  Third, if turbidity at any monitoring station exceeds the specified threshold, the Corps must implement corrective measures to address the exceedance.  [NMFS_11-12, 20-21].  Appropriate corrective measures may include, for example, measures to correct disposal vessel leakage or to reduce overflow of dredged material from dredges or transport vessels.  [NMFS_12].  If

13

the exceedance persists despite the corrective measures, the agencies must reinitiate consultation.  [NMFS_21].  Those requirements are in addition to the monitoring required under the project specifications and the disposal site management plan.  *See* [NMFS_12, 21; USACE_3469-70].

Based on the Corps' agreement to implement the enhanced monitoring plan and the other information contained in the consultation record, the Service concurred with the Corps' determination that the Project is not likely to adversely affect listed corals or designated critical habitat.  [NMFS_4, 16, 21-22].  The Corps also determined in its environmental assessment that the Project would have no significant impact on threatened corals or critical habitat, incorporating the results of its consultation with the Service.  [USACE_38, 167-68, 175-78, 194, 199].

### b.    Communities with environmental justice concerns

The Corps also evaluated the Project's potential impacts on communities with environmental justice concerns.  The Corps concluded that the Project will not have a disproportionate adverse impact on such communities given the nature and limited scope of its potential adverse effects.  [USACE_185-88, 803-04].

As the Corps explained, diverse communities exist in the area around the harbor, with some meeting environmental justice criteria.  [USACE_187].  Those communities could be affected by dredging or by the resulting changes in shipping traffic.  [USACE_185].  The Corps concluded, however, that dredging impacts

would be confined to the water-based navigation system, with work areas located far from residential communities.  [USACE_186].  Emissions from diesel-powered dredges are expected to dissipate quickly due to the area's nearly constant trade winds and sea breezes.  [USACE_180].  And the Project otherwise is expected to cause only temporary and minor adverse impacts to water quality in the areas near dredging activities, which will not significantly impact potential subsistence fishing or otherwise disproportionately impact any area communities with environmental justice concerns.  [USACE_39, 186].

The Corps also explained that the Project would not change the amount of cargo moving through the port, except for LNG (which would increase) and diesel (which would decrease) if the Authority pursued its contemplated LNG terminal in the industrial area near the San Juan powerplant.  [USACE_187].  The number of vessels needed to transport forecasted cargo would decrease, the Corps explained, because large vessels using the deeper channels would be able to carry more cargo. The Project thus is not expected to adversely affect air quality or noise levels in the area.  [USACE_180-83, 187].  The Corps further explained that if the Authority modified its powerplants to burn LNG instead of diesel, air quality would improve because LNG "does not have the undesirable by-product emissions" of diesel and other fuel oils.  [USACE_180-81, 187].  The Corps thus concluded that any changes in shipping traffic also would not adversely impact the general area or

have a disproportionate adverse impact on communities with environmental justice concerns.  [USACE_187-88].

### c.    Cumulative impacts

The Corps next determined that the Project is unlikely to contribute to cumulatively significant impacts.  [USACE_188-89].  Because the Project's adverse effects will be largely limited to minor impacts on water quality near the dredging areas, [USACE_38, 186], the Corps concluded that most resources are at little risk of being cumulatively impacted, [USACE_189].

The Corps identified two projects that could have adverse water quality impacts in the same areas during the same timeframe:  the Coast Guard's relocation of navigational buoys and its dredging of an area known as Anchorage F.  [USACE_189].  The Corps concluded that both projects posed minimal risks of contributing to cumulative impacts because they are limited in scope and subject to requirements that minimize potential adverse effects.  *Id*.

### 4.    Supplemental environmental analyses and the New Fortress Energy facility

The Project included an option to place dredged material in Condado Lagoon, located to the east of the harbor, to restore seagrass and improve water quality.  [USACE_34].  After the Corps approved the Project in 2018, it considered dredging an additional area to provide sand for those improvements.  The Corps determined that the change required a supplemental environmental assessment, and

16

in November 2021, the Corps released a draft for public comment.
[USACE_24475].  The Corps issued its final supplemental analysis in January
2023.  [USACE_24434-24479].  Although the agency ultimately decided not to use
the additional dredging area and confirmed that all dredged material would be
transported to the disposal site, [USACE_24470-71], two aspects of the Corps'
supplemental analyses are relevant here.

First, in response to public comments, the Corps expanded the geographic
scope of the Project's environmental justice analysis to encompass additional
communities with environmental justice concerns.  [USACE_24589, 24687-93].
The Corps explained that its original analysis focused on the area within a one-mile
radius of the cruise ship terminal, which covered the most impoverished area in the
project vicinity.  [USACE_24476].  In response to public comments, the Corps
expanded the analysis to cover both a one-mile and a five-mile radius around the
entire harbor.  [USACE_24476].  Using either metric, the Corps again concluded
that the Project will not have a disproportionate adverse impact on communities
with environmental justice concerns.  [USACE_24476, 24688-89].

Second, in the context of updating its ESA consultation with the U.S. Fish
and Wildlife Service, the Corps noted that in 2019, New Fortress Energy built a
micro LNG handling facility in San Juan Harbor that provides natural gas to the
Authority's San Juan powerplant.  [USACE_24663]; *see also* [USACE_21539-40,

17

24467-68, 24640, 25731-32].  The Corps concluded that the existence of this facility, which has been operating since 2020, did not alter its prior analysis of the Project's environmental effects.  [USACE_24663].

The New Fortress micro-facility does not require any new dredging because it does not receive LNG deliveries directly from large LNG tankers.  Instead, smaller shuttle vessels deliver LNG to a floating storage unit "after conducting lightering operations with ocean-going, bulk-carrier LNG tankers which are anchored off the coast of Puerto Rico outside of Puerto Rican waters."  *New Fortress Energy LLC*, 174 FERC ¶ 61207, p.3 (March 19, 2021); *New Fortress Energy Inc. v. FERC*, 36 F.4th 1172, 1175 (D.C. Cir. 2022).  New Fortress built the facility without FERC approval but has since applied for authorization to continue current operations.  [USACE_24663].  FERC "will conduct a NEPA analysis based on" New Fortress's pending application.  174 FERC ¶ 61207, p.33.[2]

Separately, in June 2022, Plaintiffs gave notice to the Corps and the Service of Plaintiffs' intent to sue under the ESA.  [USACE_21554-69]; *see* 16 U.S.C. §

---

[2] New Fortress's application confirms that "[n]o facility-specific dredging … is required to keep the … Facility accessible by shuttle vessels or other support vessels during operations," and that New Fortress "has no existing or reasonably foreseeable plans to expand" the facility.  FERC Docket No. CP21-496-000, Document Ascension No. 20210915-5107, Resource Report 1 at 1-10, 1-14; *see also id*. at 1-11, 2-3, 3-12 (available at https://elibrary.ferc.gov/eLibrary/search).  If necessary, the Court may take judicial notice of the content of New Fortress's application because it is a public record whose contents cannot reasonably be disputed.  *New York v. Meta Platforms, Inc*., 66 F.4th 288, 303 (D.C. Cir. 2023).

1540(g)(1)(A).  Plaintiffs alleged in part that the agencies were violating the ESA by not reinitiating consultation to address a 2019 study showing that the impacts of the Miami dredging project "were vastly larger than predicted."  [USACE_21566].

The Service reviewed the 2019 study and concluded that it did not indicate that the Project may affect listed corals or critical habitat in a manner or to an extent not previously considered—the relevant trigger for reinitiating consultation. [NMFS_1-3]; *see* 50 C.F.R. § 402.16(a)(2).  The Service explained that key differences between the two projects made it "extremely unlikely" that the Project would cause adverse effects like those observed in Miami.  [NMFS_1-3].

## C.    Proceedings below

Plaintiffs sued the Corps and the Service in August 2022, alleging violations of NEPA and the ESA.  [ECF.1].[3]  After the agencies filed their administrative records, the parties cross-moved for summary judgment.  In July 2023, the district court issued an opinion and order denying Plaintiffs' motion and granting the agencies' cross-motion.  [ECF.33-34].

The court first held that the Service complied with the ESA in concluding that the Project is not likely to adversely affect listed corals or their critical habitat.

---

[3] Plaintiffs also brought Clean Water Act claims against the Corps, additional ESA claims against the Service relating to proposed critical habitat, and ESA claims against the U.S. Fish and Wildlife Service.  Because Plaintiffs have not pursued those claims on appeal, they are not discussed further.

[ECF.34 at 15-18].  The Service adequately explained the differences between the San Juan and Miami projects, the court reasoned, and properly relied on the Corps' commitment to implement enhanced monitoring, including "specific guardrails" to ensure that the agencies' prediction of no adverse effects remains correct.  *Id*.

The court next held that the Corps' 2018 environmental assessment complied with NEPA.  [ECF.34 at 20-30].  The Corps did not improperly segment NEPA review of the Project and the Authority's envisioned LNG terminal, the court explained, because the terminal was not the subject of any pending federal proposal requiring NEPA review, the Authority's LNG plans were uncertain, and the Project had independent utility regardless of the Authority's plans.  [ECF.34 at 21-23].  The court also held that the Corps had adequately analyzed the Project's potential cumulative impacts and its potential impacts on listed corals and communities with environmental justice concerns.  [ECF.34 at 23-27].

## SUMMARY OF ARGUMENT

1.      The Corps did not segment NEPA review of the Project and the dredging-dependent LNG terminal that the Authority envisioned in 2018.  Plaintiffs forfeited their contrary arguments, which lack merit in any event.  The contemplated terminal is not a connected or cumulative action or an indirect effect of the Project that the Corps was required to analyze in its 2018 environmental assessment because the Corps was not proposing to approve the contemplated

20

terminal; the terminal required FERC's approval under the Natural Gas Act; the Authority had not submitted any proposal to FERC; it was uncertain if a proposal would be submitted; and the Corps reasonably determined that the Project was fully justified regardless of the Authority's LNG plans.

2.     The Corps took a hard look at the Project's potential cumulative impacts.  The environmental assessment thoroughly discusses the baseline conditions in the study area (which reflect the impacts of past actions), analyzes the Project's additive effects, and properly evaluates whether other proposed actions in the area could combine with the Project to cause a cumulatively significant impact.  NEPA required nothing more, and Plaintiffs fail to identify a single additional project with overlapping effects that the Corps overlooked.

3.     The Corps took a hard look at the Project's potential impacts on communities with environmental justice concerns.  The Corps' expanded analysis encompasses the communities of Cataño and Guaynabo referenced in Plaintiffs' brief.  The Corps also reasonably determined that the Project will not have a disproportionate adverse impact on any communities with environmental justice concerns given the limited scope of potential adverse effects.  And the Corps' procedures for involving the public were reasonably designed to encourage participation by interested members of all potentially affected communities, including those with environmental justice concerns.

21

4.     The agencies' analysis of the Project's potential effects on listed corals and their critical habitat complied with the ESA and satisfied the Corps' NEPA duties.  The available baseline data allowed for informed decision-making.  The agencies considered the adverse impacts observed in Miami, and the Service reasonably explained that key differences between the two projects make it unlikely that the Project will have similar impacts.  The enhanced monitoring plan is reasonably designed to ensure that adverse impacts do not occur.  And the Service's conclusion that the Project is unlikely to adversely affect listed corals or critical habitat is reasonable, supported by the record, and entitled to deference.

## STANDARD OF REVIEW

The Court reviews the district court's grant of summary judgment to the agencies de novo, "as if the agency's decision had been appealed to this [C]ourt directly."  *Gerber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002).  The Court reviews the challenged agency decisions under the APA, which authorizes a reviewing court to set aside agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  An agency acts arbitrarily or capriciously when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs bear the burden of showing that the challenged agency decisions are arbitrary or capricious. *Village of Bensenville v. FAA*, 457 F.3d 52, 70-71 (D.C. Cir. 2006). As demonstrated below, Plaintiffs have not met their burden.

## ARGUMENT

**I.** **Plaintiffs' segmentation claims are forfeited and lack merit in any event.**

"An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304, 1313 (D.C. Cir. 2014). Plaintiffs argue that the Corps improperly segmented NEPA review of the Project and the dredging-dependent LNG terminal that the Authority envisioned in 2018, which Plaintiffs assert was a connected or cumulative action or an indirect effect of the Project that the Corps had to analyze in its 2018 environmental assessment. Opening Br. 12-17, 20, 22-25. But Plaintiffs forfeited those arguments by failing to raise them during the comment period on the draft assessment. And the arguments lack merit in any event.

### A.    Plaintiffs forfeited their segmentation arguments.

Persons "'challenging an agency's compliance with NEPA must structure their participation so that it … alerts the agency to the [parties'] position and contentions,' and failure to do so 'forfeit[s] any objection' to the environmental analysis on that ground." *Sierra Club v. FERC*, 827 F.3d 36, 50-51 (D.C. Cir. 2016) (quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004)).  To "preserve a legal or factual argument," its proponent must "have given the agency a fair opportunity to entertain it in the administrative forum before raising it in the judicial one." *Center for Sustainable Economy v. Jewell*, 779 F.3d 588, 601 (D.C. Cir. 2015).  Plaintiffs did not preserve their objections to the Corps' consideration of the Authority's LNG plans in the 2018 environmental assessment because Plaintiffs' comments did not raise any of those objections.  *See* [USACE_1200-07].  Plaintiffs offer two arguments in response, but neither has merit.

Plaintiffs first contend that their claims were "directly before the Corps" because the agency knew that the Authority "needed the dredging" for the contemplated LNG.  Opening Br. 17 n.4.  This argument fails.  That the Authority "needed the dredging" may be the factual basis for Plaintiffs' claims, but the claims themselves were not timely raised in any manner, let alone with "sufficient precision, clarity, and emphasis to give the agency a fair opportunity to address [them]." *Center for Sustainable Economy*, 779 F.3d at 602.  Nor did the

Authority's "need for the dredging" make it obvious that the Corps allegedly had to conduct NEPA review of the contemplated LNG terminal.  On the contrary, there was no reason for the Corps to reach that conclusion because the Corps was not proposing to approve any new LNG infrastructure; the contemplated LNG terminal required FERC's approval; no proposal had been submitted to FERC; whether the Authority would proceed with its LNG plans was uncertain; and the Project had independent utility.  *See infra* pp. 26-30.

Second, Plaintiffs argue that their claims were preserved because an individual submitted materials to the Corps "relating to LNG deliveries."  Opening Br. 17 n.4 (citing [USACE_2324-457].  This argument also fails.  The bulk submission of administrative filings relating to an LNG facility on the south side of Puerto Rico did not raise Plaintiffs' claims with "precision" or "clarity."  *Center for Sustainable Economy*, 779 F.3d at 602.  Indeed, the materials have no apparent relevance to Plaintiffs' claims.  Consequently, those claims are forfeited.

### B.    Plaintiffs' segmentation arguments lack merit.

In any event, Plaintiffs' segmentation claims lack merit because the dredging-dependent LNG terminal that the Authority envisioned in 2018 is not a connected or cumulative action or an indirect effect of the Project.

**1.    The Authority's contemplated LNG terminal is not a connected action.**

The LNG terminal that the Authority envisioned in 2018 is not a connected action that the Corps had to analyze in its 2018 environmental assessment because the Corps was not proposing to approve the terminal, there was no associated federal proposal requiring NEPA review, and the Project has independent utility.

NEPA's procedural requirements are triggered by "proposals for … major Federal actions."  42 U.S.C. § 4332(2)(C); *National Wildlife Federation v. FERC*, 912 F.2d 1471, 1477-78 (D.C. Cir. 1990).  A proposal "exists at that stage in the development of an action when an agency … has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated."  40 C.F.R. § 1508.23.  "Proposals … which are related to each other closely enough to be, in effect, a single course of action" must be evaluated together, and agencies must "use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular" NEPA analysis.  *Id*. § 1502.4(a).

Section 1508.25(a)(1) provides that "connected actions" should be discussed "in the same impact statement."  Actions are "connected" if they (i) automatically "trigger other actions which may require" a NEPA analysis; (ii) cannot "or will not proceed unless other actions are taken previously" or simultaneously; or (iii) are "interdependent parts of a larger action and depend on the larger action for their

26

justification." *Id.* "The point of the connected actions doctrine is to prevent the government from segmenting *its own federal actions* into separate projects and thereby failing to address the true scope and impact of the activities that should be under consideration." *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 49-50 (D.C. Cir. 2015) (cleaned up, emphasis added). Under NEPA, "proposals for … actions that will have cumulative or synergistic environmental impact upon a region … *pending concurrently before an agency* … must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (emphasis added). But in the absence of pending and related federal proposals requiring NEPA review, the connected-actions doctrine is inapplicable. *See National Wildlife Federation*, 912 F.2d at 1477-78.

*National Wildlife Federation* is instructive. There, the applicant submitted two proposals for FERC's approval relating to the first and second phases of a hydroelectric project, but the applicant later withdrew its proposal for Phase II. The petitioners asserted that the EIS for Phase I was deficient because it did not analyze the impacts of Phase II as a connected or cumulative action, and only considered certain benefits relating to Phase II. *Id.* at 1474, 1476-79. The Court disagreed, explaining that an EIS "need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be

connected to or act cumulatively with the proposal at issue." *Id*. at 1478.  Because FERC "did not have before it a proposal for a license as to Phase II" and "in no way approved Phase II," FERC was not required to consider the environmental impacts of Phase II.  *Id*. at 1478-79; *accord Minisink Residents for Envtl. Pres. and Safety v. FERC*, 762 F.3d 97, 113 n.11 (D.C. Cir. 2014) (projects not connected where proponent of later-in-time project "had not yet applied" for federal approval); *City of Boston*, 897 F.3d at 252 (proposals not connected where they were "not under simultaneous consideration by the agency").

Here as well, the Corps was not proposing to approve the Authority's contemplated LNG terminal.  That project instead would require FERC's approval under the Natural Gas Act, [USACE_1278], which alone precludes a finding that the two projects are connected, *see Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1185 (D.C. Cir. 2023) (connected-action doctrine did not require FERC "to consider the indirect effects of actions beyond its delegated authority").  And, contrary to Plaintiffs' assertions, Opening Br. 15-16, the Corps' consideration of the economic benefits of the Authority's potential conversion to LNG did not "bind" the agency to conduct a comprehensive analysis of "the future harms and benefits of a proposal not before it," *Nat'l Wildlife Fed'n*, 912 F.2d at 1478-79.

Moreover, as of 2018, the Authority had not yet submitted any proposal to FERC and whether it would do so was uncertain.  [USACE_151, 875].  Five years

later, the Authority still has not sought FERC's authorization to construct the dredging-dependent LNG terminal it contemplated in 2018—and whether the Authority will do so remains "speculative and hypothetical." *National Wildlife Federation*, 912 F.2d at 1478; *see also* [USACE_25732].

Plaintiffs counter that the Corps itself concluded in 2018 that the Authority's transition to LNG seemed a "reasonable future assumption." Opening Br. 16, 22, 23 (quoting [USACE_151]). But the Authority's potential transition to LNG did not require the $350 million, dredging-dependent terminal it envisioned in 2018. On the contrary, the Corps recognized that the Authority could pursue other LNG delivery options, [USACE_152, 873-75], which is exactly what occurred, *see New Fortress Energy*, 36 F.4th at 1175.

The Project and the contemplated LNG terminal also are not connected because they are not "financially and functionally interdependent." *City of Boston*, 897 F.3d at 252. Two projects lack interdependence where the first "will serve a significant purpose" even if the second is not built and is financially viable considered alone. *Id.* Both factors apply here. The Project serves a significant independent purpose because it will expand "the existing depths and widths of the Federal channels," which "place constraints on vessels currently calling on San Juan Harbor." [USACE_33, 114]. And the Project is economically justified considered alone because of the "efficiencies that would result from the use of a

29

smaller number of vessels loading deeper and more efficiently to bring to the same

quantity of goods to San Juan," which will "provide up [to] $4.3M per year in

transportation cost savings" in the no-LNG scenario.  [USACE_187].

Plaintiffs insist that two projects are connected because the Authority made

clear that construction of its contemplated LNG terminal will not occur without the

Project.  Opening Br. 13-16.  Plaintiffs have it backwards.  Because the Corps'

approval of the Project is the only relevant federal "action" subject to NEPA, the

question under the regulation is whether *that action* "[c]annot or will not proceed

unless" the Authority's LNG plan is "simultaneously" implemented.  40 C.F.R. §

1508.25(a)(1)(ii).  As discussed, the Project can and will proceed even if the

Authority's LNG plans are never implemented.

Where (as here) one project "might reasonably have been completed without

the existence of the other, the two projects have independent utility and are not

'connected' for NEPA purposes."  *Great Basin Mine Watch v. Hankins*, 456 F.3d

955, 969 (9th Cir. 2006); *see also Hudson River Sloop Clearwater v. Department

of Navy*, 836 F.2d 760, 763-64 (2d Cir. 1988) (operational and housing aspects of

proposed Navy port were not "connected" under Section 1508.25(a)(1)(ii), even

though the housing would not proceed without operational improvements, because

the improvements would be implemented with or without the new housing).

###### 2.    The Authority's contemplated LNG terminal is not a cumulative action.

The LNG terminal contemplated by the Authority in 2018 also is not a "cumulative action," which "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same" NEPA analysis.  40 C.F.R. § 1508.25(a)(2).  Cumulative actions can include non-federal projects.  *Id*. § 1508.7.  But where (as here) the contemplated project requires federal approval, it does not qualify as a reasonably foreseeable cumulative action unless it has reached at least the proposal stage.  *See National Wildlife Federation*, 912 F.2d at 1478; *see also Theodore Roosevelt*, 616 F.3d at 513-14 (agency's publication of notice of intent to prepare EISs for two future projects "did not establish reasonable foreseeability of the incremental impact of those projects in connection with [the challenged agency action]," where the two projects had "uncertain futures").  Because there was no (and still is no) federal proposal associated with the dredging-dependent LNG terminal that the Authority envisioned in 2018, construction of the terminal is not a cumulative action that the Corps had to analyze in its 2018 environmental assessment for the Project.

Furthermore, the effects of the Project and the contemplated LNG terminal could combine to cause a cumulatively significant impact only if those effects overlap.  *See City of Boston*, 897 F.3d at 253 (cumulative impacts from two projects not reasonably anticipated where they would "not overlap in time,"

31

because the "short-term impacts from constructing the former would abate before construction commenced on the latter"); *Minisink*, 762 F.3d at 113 (same). Because the Authority still has not sought FERC's authorization to construct the dredging-dependent LNG terminal it envisioned in 2018, no such overlap exists here. Dredging is scheduled to begin in 2024, will take about 12 months to complete, and will have only "temporary and minor adverse impacts to water quality in the areas near dredging activities." [USACE_38]. The Authority estimated that construction of its envisioned LNG terminal would not begin until at least 2.5 years after any FERC review process commences. [USACE_1278]. The effects of both projects thus could not be expected to combine to cause a cumulatively significant impact.

### 3. The potential future construction of the contemplated LNG terminal is not an indirect effect of the Project.

Nor is the potential future construction of the LNG terminal envisioned by the Authority in 2018 an indirect effect of the Project. Indirect effects are "caused by" the proposed action and "are later in time … but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). The effects of constructing the contemplated terminal were not reasonably foreseeable in 2018 (and remain unforeseeable today) because the terminal required FERC's approval, [USACE_1278]; no proposal had been submitted to FERC; it was uncertain if a proposal would be submitted, [USACE_151, 875]; and the terminal lacked even a "[c]onceptual design,"

32

[USACE_1280]. *See Center for Biological Diversity*, 67 F.4th at 1185-86 (NEPA analysis of natural gas project did not need to address effects of private entity's plans to divert gas to Alaska because of "uncertainties" relating to its ability to secure contracts with buyers, state regulatory approval, and construction of subsidiary pipelines, which had not yet been proposed).

Moreover, even assuming that the hypothetical future construction of the contemplated terminal is "dependent on" the Project, Opening Br. 25, "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA." *Public Citizen*, 541 U.S. at 767. NEPA "requires a reasonably close causal relationship between the environmental effect and the alleged cause," which is analogous "to the familiar doctrine of proximate cause from tort law." *Id*. No such causal relationship exists here. Instead, the proximate causes of any future terminal construction would be the Authority's decision to pursue the project and FERC's approval of an actual proposal, which the Authority has not yet submitted. *See Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016) (NEPA analysis for proposed action did not need to address the indirect effects of a future proposal that would be subject to another agency's licensing authority).

*Eagle County v. Surface Transportation Board*, 82 F.4th 1152 (D.C. Cir. 2023), does not suggest otherwise. There, the "undisputed purpose" of the federally-approved railway was to allow oil produced in Utah to be transported to

existing Gulf Coast refineries.  *Id*. at 1179-80.  The Court held that the approving agency had to conduct some "reasonable forecasting" of the environmental impacts of the refinement process.  *Id*. at *1178.  Here, in contrast, the Project has independent utility; the Authority's contemplated LNG terminal does not exist; the terminal is not even the subject of a proposal before the agency that would have to approve it; and the Authority's LNG plans remain, according to Plaintiffs, shrouded in "significant uncertainty," [USACE_25732].

Moreover, the Corps conducted reasonable forecasting by considering the effect of the Authority's potential conversion from diesel to LNG on shipping traffic and air quality.  [USACE_115, 139, 180-81, 187].  A more comprehensive NEPA analysis of the impacts of constructing and operating the contemplated terminal could be required only after the Authority submits a concrete proposal to FERC.  *See National Wildlife Federation*, 912 F.2d at 1477-78.

## II.    The Corps' cumulative impact analysis complied with NEPA.

Plaintiffs advance two additional criticisms of the Corps' cumulative impact analysis that are unrelated to the Authority's LNG plans.  Both lack merit.

Plaintiffs first assert that the Corps failed to identify the relevant area for purposes of its analysis.  Opening Br. 18-19.  That is incorrect.  The environmental assessment clearly defines the Study Area for purposes of the analysis, including the cumulative impact review.  *See* [USACE_56].

Plaintiffs next assert that the Corps "failed to identify all past, present, proposed, and reasonably foreseeable future actions that have had or are expected to have impacts" in the study area. Opening Br. 19. That argument also fails. The environmental assessment discusses baseline conditions in the study area (which reflect the impacts of past actions), analyzes the Project's additive effects, and properly evaluates whether other proposed actions in the same area could combine with the Project to cause a cumulatively significant impact.

As the Corps explained, San Juan Harbor is an industrialized port impacted by "[c]enturies of development." [USACE_74, 95]. The Corps thus thoroughly analyzed the existing and without-project conditions in the study area, discussing past and ongoing activities that have impacted water quality, air quality, and other aspects of the physical environment. *See* [USACE_60-109]. Plaintiffs have not shown that the Corps' analysis fails to adequately capture the impacts of past actions, and NEPA did not also require a comprehensive listing of every past action that has contributed to the current baseline conditions. *See* 40 C.F.R. § 1500.1(b) ("NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."). The Corps then analyzed how the Project's additive effects could impact those baseline conditions. *See* [USACE_153-188]. And the Corps' cumulative impact analysis properly focused on whether any specific projects in the study area would "overlap

35

in time" with the Project, potentially combining to cause a cumulatively significant impact. *City of Boston*, 897 F.3d at 253; [USACE_188-89].

As discussed, the Corps determined that the Project would cause minor adverse impacts on water quality near the dredging areas. [USACE_38]. Given the limited scope of those impacts, the Corps reasonably concluded that most resources in the study area are "at little risk of being cumulatively impacted." [USACE_189]. The Corps then identified two actions that could impact water quality in the same areas during the same timeframe. *Id*. And the Corps reasonably explained why those two projects pose minimal risks of combining with the Project to produce a cumulatively significant impact. *Id*.

Plaintiffs do not challenge the Corps' assessment of the two projects. And Plaintiffs do not identify a single additional project with overlapping effects that the Corps allegedly overlooked. Plaintiffs reference the 2015 feasibility report from the Authority's consultants that recommended Option 14. Opening Br. 20 (citing [USACE_8031-62]). But the recommended LNG terminal is not a cumulative action. *See supra* pp. 31-32. Plaintiffs also reference a 2013 biological assessment for a prior dredging project in San Juan Harbor. Opening Br. 19 (citing [USACE_10316-56]. But the assessment concluded that the project would *not* adversely affect any listed species, [USACE_10329, 10335, 10340], and it does not suggest that the project caused any other persisting adverse effects.

36

Plaintiffs thus have not shown that the Corps' analysis is deficient. Although the analysis may be brief, an environmental assessment need only "include brief discussions" of environmental impacts. 40 C.F.R. § 1508.8(b). The scope of the analysis is commensurate with the Project's minimal adverse effects, and the environmental assessment as a whole demonstrates that the Corps did not consider those effects "in a vacuum." *TOMAC v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (agency's cumulative impact analysis sufficed where it identified one future project posing minimal risks, and the plaintiff did not identify any other projects that could combine to produce significant negative impacts).

## III. The Corps' environmental justice analysis complied with NEPA.

"The principle of environmental justice encourages agencies to consider whether the projects they sanction will have a disproportionately high and adverse impact on low-income and predominantly minority communities." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (cleaned up). Here, the Corps properly considered the Project's potential impacts on such communities. Plaintiffs' contrary arguments are either moot or lack merit.

The Corps recognized that some communities around San Juan Harbor meet environmental justice criteria and could be impacted by the dredging or resulting changes in shipping traffic. [USACE_185, 187]. The Corps reasonably concluded, however, that those communities are unlikely to be disproportionately

37

impacted because the Project's adverse impacts will be limited to minor impacts on water quality near the dredging areas, [USACE_186-88, 24476, 24687-93], and the Project's secondary effects include "reduced and less concentrated air emissions, noise and vessel traffic," [USACE_187].

Plaintiffs argue that the analysis improperly omitted the communities of Cataño and Guaynabo. Opening Br. 26-28. That claim is moot because the Corps' supplemental environmental assessment expanded the geographic scope of the analysis to include both communities, [USACE_24589, 24687-93], and the Court "cannot order [the Corps] to do something" it has "already done," *Better Government Association v. Department of State*, 780 F.2d 86, 91 (D.C. Cir. 1986); *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 866 (D.D.C. 1991) (objections to environmental assessment's population estimates mooted by updated assessment containing actual values).

Plaintiffs counter that the updated and expanded analysis is an improper post hoc rationalization. Opening Br. 31-32. That is incorrect. The Corps properly updated the analysis in response to public comments on its draft supplemental environmental assessment issued in November 2021. *See supra* pp. 16-18. Preparation of the supplement was a valid administrative action triggered by the Corps' proposal to use an expanded dredging area for restoration activities. *See* 40 C.F.R. § 1502.9(c)(1). The regulations do not prohibit an agency from revisiting

portions of its prior analysis during the supplementation process. And because the regulations direct an agency to include any supplement "into its formal administrative record," *id*. § 1502.9(c)(3), the Corps' updated analysis is part of the "record before the agency," *Calcutt v. FDIC*, 598 U.S. 623, 628 (2023).

Plaintiffs next assert that the Corps failed to consider the risk of oil spills from larger tankers that will use the expanded shipping channels. Opening Br. 29. That too is wrong. The Corps found that "the deepening and widening of the channels within the harbor is expected to improve safety and navigability, reducing the potential for ship groundings and subsequent oil spills." [USACE_3498]. By facilitating vessel maneuverability and reducing congestion, [USACE_113-14], the Project will address conditions that have led to past groundings, allisions, and collisions, [USACE_3456]. Plaintiffs cite their own comment letter, Opening Br. 29 (citing [USACE_2313-15], but it contains no contrary evidence suggesting that the presence of large petroleum vessels in the harbor will increase the risk of an oil spill despite the Project's navigational improvements.

Finally, Plaintiffs argue that the Corps prevented members of Spanish-speaking communities and communities with environmental justice concerns from participating in the NEPA process because the agency did not provide a Spanish translation of the draft environmental assessment or extend the public comment

period in response to hurricanes Irma and Maria.  Opening Br. 29-30.  This argument also lacks grounding in the record.

The Corps sent letters to interested parties in both English and Spanish announcing the commencement of public scoping and the availability of the draft environmental assessment.  [USACE_1129-34, 1228-33].  The letters announcing the release of the draft were sent to Ruth Santiago, an attorney representing local community and environmental organizations, along with instructions on how to download the draft, [USACE_2492, 2514-21].  During its public meeting, the Corps provided an overview of the draft in both English and Spanish.  [USACE_2460-61, 2478-79].  The Corps also offered to provide, on request, hardcopies of the Spanish version of its presentation or a Spanish translation of any portion of the draft assessment, [USACE_2492-94], and noted that comments could be submitted in Spanish, [USACE_2478].

Furthermore, although Sierra Club inquired whether the comment period would be extended due to the hurricanes, [USACE_2302], neither Sierra Club nor anyone else requested an extension.  Nor did anyone request that the comment period be reopened at any point before the final environmental assessment was issued in August 2018, nearly a year later.  And no one submitted late comments that the Corps declined to consider.

Plaintiffs thus have not shown that the procedures employed by the Corps unreasonably discouraged the participation of Spanish-speaking persons or members of communities meeting environmental justice criteria.

## IV. The agencies' analyses of potential impacts on corals complied with NEPA and the ESA.

The Corps determined that the Project would have no significant impact on threatened corals or their critical habitat after completing ESA consultation with the Service. *See supra* pp. 11-14. The record shows that the agencies carefully considered potential impacts on corals, with the Service initially questioning aspects of the Corps' analysis and concurring with the Corps' determination only after the Corps provided additional information and agreed to enhanced monitoring requirements that addressed the Service's concerns. *Id*. The agencies' analyses complied with the ESA and NEPA, and Plaintiffs' contrary arguments lack merit.

### A. The baseline data considered by the Corps allowed for informed decision-making.

Plaintiffs contend that the Corps violated NEPA by failing to gather adequate baseline data on threatened corals and instead relying on post-approval coral surveys. Opening Br. 34-37. This argument lacks merit.

The Corps did not "rely on pre-construction surveys and mitigation measures … to understand the project's impacts on listed coral." Opening Br. 36. The Corps instead relied on ample *existing* baseline data, including the results from

sonar and video surveys, [USACE_138, 206, 3502-05; NMFS_20]; the Service's

analysis of survey results, [USACE_3502]; and other studies showing the location

of hardbottom habitat in the project vicinity, [USACE_1737, 3485-87].

Plaintiffs do not identify any baseline data that the Corps "failed to

evaluate." Opening Br. 34. And the agency's commitment to conduct additional

pre-construction surveys to verify the absence of listed corals and the documented

separation distances between the dredging areas and critical habitat, [USACE_138,

197], does not establish that the existing baseline data precluded informed

decision-making. *See Colorado Environmental Coalition v. Dombeck*, 185 F.3d

1162, 1172-73 (10th Cir. 1999) (agency complied with NEPA where (as here) it

used the best available data and plaintiffs failed to show that additional data was

essential to reasoned decision-making).

## B.    The agencies reasonably accounted for the distinct Port of Miami project.

Plaintiffs next assert that the agencies ignored studies documenting the

adverse impacts of the Miami project. Opening Br. 33-34, 44. That too is wrong.

As Plaintiffs note, the Corps used a 150-meter indirect impact zone in its

NEPA analysis based on the results of prior comparable dredging projects and on

data from the Miami project suggesting that the potential for adverse impacts is

greatest in the areas directly adjacent to the dredged channels. [USACE_167, 176-

77, 3506-08, 3511-12, 3519]. But the Corps also agreed to implement an enhanced

monitoring plan in response to the Service's concerns about the Miami project—
concerns driven by the same information cited in Plaintiffs' brief. *See*
[NMFS_172-74, 790-847]; *see also* [USACE_1647-49, 1703-20].

That the environmental assessment itself does not recount the consultation
history that led to the enhanced monitoring requirements is irrelevant. Judicial
review is based on the "whole record," 5 U.S.C. § 706, and courts will "uphold a
decision of less than ideal clarity" where "the agency's path may reasonably be
discerned," *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986); *Defenders of
Wildlife v. Dep't of Navy*, 733 F.3d 1106, 1120 n.6 (11th Cir. 2013). The Corps'
consideration of the Miami project is reasonably discernible from the record.

Moreover, after consultation was completed, the Service reviewed the 2019
study establishing, "for the first time," a link between sediment plumes detected
during the Miami project and the resulting benthic impacts. [NMFS_691]. Before
that study, there were "conflicting reports" as to whether the impacts were
attributable to dredging or to other factors. [NMFS_679]; *see also* [NMFS_708,
751-53]. The Service carefully reviewed the 2019 study and concluded that the
Project is "extremely unlikely" to cause similar adverse impacts because of the key
differences between the two projects. [NMFS_1-3].

As the Service explained, the Miami project involved dredging a long outer
entrance channel, cutting directly across three tracts of coral reef and extending

43

into open ocean.  Listed corals and critical habitat were present throughout the project area.  [NMFS_1-2, 679-80].  In contrast, no listed corals are present within San Juan Harbor; dredging will take place entirely within the harbor, beginning with the innermost segment of the entrance channel; and the nearest critical habitat is 2,500 feet from closest area to be dredged.  [NMFS_2, 19-21; USACE_30].  The Miami project also involved three times as much dredged material, which consisted primarily of consolidated limestone rock.  Measures to break up the consolidated rock created high levels of suspended solids, and similar practices have caused adverse impacts in the past.  [NMFS_1-2, 715, 734].  The Project does not pose similar risks because the material to be dredged is primarily silt and clay, which have different properties and are not expected to produce as much suspended material.  [NMFS_2, 11, 20].  The hydrodynamic processes that contributed to the transport of dredged material in Miami also differ from conditions in and around San Juan Harbor.  [NMFS_1-2].

Plaintiffs do not challenge the Service's conclusion that the two projects are distinct.  Instead, they argue that the Service's analysis of the 2019 study explaining the key differences is an improper post hoc rationalization.  Opening Br. 44.  Plaintiffs are wrong.  The Service properly prepared its analysis pursuant to 50 C.F.R. § 402.16(a)(2), which obligates the agency to determine whether new information warrants reinitiation of consultation.  Plaintiffs could have pursued

their claim that the 2019 study requires reinitiation and challenged the Service's

contrary analysis, [USACE_21566], but they elected not to do so, [ECF.34 at 18

n.6]. And the Service's analysis reasonably explains why the Project is unlikely to

cause the adverse impacts observed in Miami.[4]

C.    **The agencies properly relied on enhanced monitoring to ensure that listed corals are not adversely affected.**

Plaintiffs next assert that the agencies improperly relied on the Corps'

commitment to implement an enhanced monitoring plan because the plan is too

vague to satisfy their ESA responsibilities and the Corps' duties under NEPA.

Opening Br. 37-39, 46-49. This argument also lacks merit.

At the onset, the required plan is a *monitoring* plan, not a plan to mitigate

harm; the Service did not state that mitigation measures would be imposed "to

offset the impacts of the dredging project." *Id*. at 47. The Project does not require

compensatory mitigation because it is not expected to cause any adverse impacts.

[USACE_138, 206; NMFS_19-20]. Plaintiffs' cases involving uncertain

compensatory mitigation plans are therefore inapposite. The Corps properly

committed to implement an enhanced *monitoring* plan to ensure that the agencies'

prediction of no adverse effects remains correct. *See Greater Yellowstone*

---

[4] In contrast to the Service's analysis, the declaration proffered by amici is not part of the administrative record for any agency decision. Nor is it part of the district court record. The declaration thus is not properly before this Court. *See IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997).

*Coalition v. Flowers*, 359 F.3d 1257, 1275 (10th Cir. 2004) (Corps complied with NEPA by reasonably concluding that its permit "will not have a significant impact" and adopting "monitoring requirements in case its conclusion is wrong").

Moreover, turbidity monitoring is not some new, untested practice, as Plaintiffs suggest. *See* Opening Br. 48. The Corps "requires turbidity monitoring with all of its projects… This has been standard practice for more than 30 years." [USACE_177]. The agencies also specified the key required components of the enhanced monitoring plan: monitoring stations must be placed adjacent to any listed corals found during preconstruction surveys and at the edge of coral critical habitat (which is located along the scow transit route); turbidity levels at each monitoring station may not exceed 7 Turbidity Units above background, a conservative threshold reasonably designed to ensure that corrective action is taken *before* "damage to corals is certain to occur," Opening Br. 49; and the agencies must reinitiate consultation if turbidity levels persist above that threshold despite corrective action. [NMFS_21]. The Corps' commitment to implement the plan is also binding and enforceable under the ESA because it was part of the action under consultation. [NMFS_11-12]; *see Center for Biological Diversity v. Bureau of Land Management*, 698 F.3d 1101, 1115 (9th Cir. 2012) (where agreed-upon measures are part of the action under consultation, "the ESA's sequential,

46

interlocking procedural provisions ensure recourse if the parties do not honor or enforce the agreement, and so ensure the protection of listed species").

That the plan may not specify the exact measures to be implemented if project-related turbidity exceeds the specified threshold is immaterial. Appropriate measures would depend on the likely cause of the exceedance and could include, for example, measures to correct disposal vessel leakage if the exceedance occurs along the scow transit route. [NMFS_12]. The critical point is that the Corps must monitor the efficacy of the selected measures and reinitiate consultation if they do not correct the exceedance. [NMFS_21]. A binding plan to implement corrective measures suffices where, as here, those measures "are likely to be adequately policed," even if the plan does not "specify which" measures will be adopted if corrective action becomes necessary. *Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*, 702 F.3d 1156, 1172, 1173-74 (10th Cir. 2012). "Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts," *Theodore Roosevelt*, 616 F.3d at 517, particularly where, as here, no adverse impacts are anticipated.

### D.    The record supports the Service's conclusion that the Project is not likely to adversely affect listed corals.

Finally, Plaintiffs argue that the Service's conclusion that the Project is unlikely to adversely affect listed corals or their critical habitat is an unexplained "flip-flop" from the views expressed in its 2017 letter to the Corps. Opening Br.

42-45.  This argument also fails.  The 2017 letter is not an authoritative agency

policy or position statement that could be the subject of an unlawful "change in

position."  *Id*. at 43.  It is a piece of staff correspondence sent during the early

stages of an ongoing interagency consultation.

True, the letter voiced concerns with certain aspects of the Corps' biological

assessment.  [NMFS_169-76].   But the Corps provided additional information,

[USACE_1647-1702]; the agencies met to discuss the Service's concerns,

[USACE_1703-20, 1734-54]; and the Corps modified its action to ensure that its

prediction of no adverse impacts remains correct, [NMFS_11-12].  In short, the

consultation process worked exactly as designed.  *See* 50 C.F.R. § 402.13(b).

The federal courts ordinarily "review only an agency's *final* action."

*National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659

(2007).  And the Service's final determination that the Project is not likely to

adversely affect listed corals or their critical habitat is reasonable and supported by

the record.  No listed corals have been documented near the dredging areas and the

closest critical habitat is 2,500 feet away.  [NMFS_20-21].  Two prior maintenance

dredging projects in the harbor caused only minor turbidity increases, none

exceeding 7 Turbidity Units above background.  [USACE_166, 1718].  Four

comparable projects elsewhere also caused no documented adverse impacts.

[USACE_167, 176-77, 3511-12].  The Project is unlikely to cause the adverse

impacts observed in Miami because of key differences between the two projects. [NMFS_1-3]. Scow transport vessels are subject to rigorous monitoring to prevent excessive leakage of dredged material. [USACE_3469-70]. And the enhanced monitoring requirements are reasonably designed to ensure that the agencies' prediction of no adverse impacts remains correct. [NMFS_11-12].

Although Plaintiffs disagree with the Service's judgment, they do not identify "an important aspect of the problem" that the Service "entirely failed to consider." *State Farm*, 463 U.S. at 43. The Service's judgment is supported by the record, "falls within its area of expertise," and "is entitled to deference," *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017).

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.[5]

---

[5] Should the Court rule in Plaintiffs' favor on any issue, Defendants request the opportunity for supplemental briefing on whether the error justifies vacatur of the challenged agency decision, which turns in part on the "seriousness" of the error. *Allied-Signal, Inc. v. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Because that standard cannot meaningfully be addressed until an error has been identified, supplemental briefing would be warranted.

Respectfully submitted,

/s/ *Kevin W. McArdle*

Of Counsel:                                    TODD KIM
                                               *Assistant Attorney General*
RACHEL D. GRAY
*Senior Civil Works Attorney*                  RACHEL HERON
U.S. ARMY CORPS OF ENGINEERS                   MICHELLE M. SPATZ
                                               CHRISTOPHER C. HAIR
KATHARINE M. ZAMBONI                           KEVIN W. McARDLE
*Attorney*                                     *Attorneys*
NATIONAL OCEANIC AND                           Environment and Natural Resources Division
ATMOSPHERIC ADMINISTRATION                     U.S. Department of Justice
                                               Post Office Box 7415
                                               Washington, D.C. 20044
                                               Tele:  (202) 305-0219
                                               kevin.mcardle@usdoj.gov

October 27, 2023
DJ No. 90-8-6-08585

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 10,930 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Kevin W. McArdle*
KEVIN W. McARDLE

Counsel for Defendants/Appellees

# ADDENDUM

## National Environmental Policy Act Regulations

40 C.F.R. § 1502.4(a) (2018)..........................................................1a

40 C.F.R. § 1502.9(c) (2018)..........................................................1a

40 C.F.R. § 1508.9 (2018) .............................................................2a

40 C.F.R. § 1508.23 (2018) ...........................................................2a

## Endangered Species Act Regulations

50 C.F.R. § 402.13...........................................................................3a

50 C.F.R. § 402.16(a) ....................................................................4a

## ADDENDUM

## <u>National Environmental Policy Act Regulations</u>

## 40 C.F.R. § 1502.4 (2018) – Major Federal Actions requiring the preparation of environmental impact statements.

(a)  Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined.  Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement.  Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

## 40 C.F.R. § 1502.9 (2018) – Draft, final, and supplemental statements.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

**40 C.F.R. § 1508.9 (2018) – Environmental assessment.**

*Environmental assessment*:

  (a) Means a concise public document for which a Federal agency is responsible that serves to:

> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

> (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

> (3) Facilitate preparation of a statement when one is necessary.

  (b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.


**40 C.F.R. § 1508.23 (2018) – Proposal.**

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated.  Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal.  A proposal may exist in fact as well as by agency declaration that one exists.

**<u>Endangered Species Act Regulations</u>**

**50 C.F.R. § 402.13 - Informal consultation**

(a) Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non–Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required.

(b) During informal consultation, the Service may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat.

(c) If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

(1) A written request for concurrence with a Federal agency's not likely to adversely affect determination shall include information similar to the types of information described for formal consultation at § 402.14(c)(1) sufficient for the Service to determine if it concurs.

(2) Upon receipt of a written request consistent with paragraph (c)(1) of this section, the Service shall provide written concurrence or non-concurrence with the Federal agency's determination within 60 days. The 60–day timeframe may be extended upon mutual consent of the Service, the Federal agency, and the applicant (if involved), but shall not exceed 120 days total from the date of receipt of the Federal agency's written request consistent with paragraph (c)(1) of this section.

## 50 C.F.R. § 402.16

(a) Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

(1) If the amount or extent of taking specified in the incidental take statement is exceeded;

(2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or
(4) If a new species is listed or critical habitat designated that may be affected by the identified action.