**ORAL ARGUMENT SCHEDULED ON JANUARY 25, 2024**

No. 23-5189

————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

EL PUENTE DE WILLIAMSBURG, CORALATIONS,
CENTER FOR BIOLOGICAL DIVERSITY,

Plaintiffs-Appellants,

v.

U.S. ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON,
NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO,
U.S. FISH AND WILDLIFE SERVICE, DEBRA HAALAND,

Defendants-Appellees.

————————————

Appeal from the United States District Court
For the District of Columbia
No. 1:22-cv-02430-CJN

————————————————————————————————————————

**PLAINTIFFS-APPELLANTS' FINAL OPENING BRIEF**

————————————————————————————————————————

Catherine Kilduff & Emily Jeffers
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7100
ckilduff@biologicaldiversity.org
ejeffers@biologicaldiversity.org

Marc Fink
Center for Biological Diversity
209 East 7th St
Duluth, MN 55805
(218) 464-0539
mfink@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1) and this Court's Order dated August 24, 2023, Appellants El Puente, CORALations, and Center for Biological Diversity submit the following Certificate as to Parties, Rulings, and Related Cases.

**A.     Parties and Amici**

The following parties appeared before the district court in this matter:

    1.     <u>Plaintiffs</u>:  El Puente, CORALations, and the Center for Biological Diversity.

    2.     <u>Defendants</u>:  U.S. Army Corps of Engineers; Scott A. Spellmon, Lieutenant and Chief of Engineers, Army Corps of Engineers; Gina M. Raimondo, Secretary of Commerce; National Marine Fisheries Service; Deb Haaland, Secretary of Interior; and U.S. Fish and Wildlife Service.

    3.     <u>Amici</u>:  Amigxs Del M.A.R. and Toabajeños en Defensa del Ambiente.

**B.     Rulings Under Review**

The rulings under review are the Order (JA1305) and Memorandum Opinion (JA1306–36) entered by the U.S. District Court for the District of Columbia (Hon. Carl J. Nichols) on July 24, 2023, in case number 1:22-cv-02430-CJN. The Memorandum Opinion is reported as *El Puente v. U.S. Army Corps of Engineers*, ___ F. Supp. 3d ___, 2023 WL 4706152 (D.D.C. July 24, 2023).

**C.    Related Cases**

There are no related cases within the meaning of D.C. Circuit Rule

28(a)(1)(C) of which undersigned counsel is aware.


Respectfully submitted November 20, 2023,


 /s/ *Catherine Kilduff*
Catherine Kilduff, Senior Attorney
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
(202) 780-8862
ckilduff@biologicaldiversity.org

*Attorney for Plaintiffs/Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 26.1(a), Appellants El Puente, CORALations, and the Center for Biological Diversity certify they have no parent companies, subsidiaries, or affiliates that have issued shares to the public.

Respectfully submitted November 20, 2023,

 /s/ *Catherine Kilduff*
Catherine Kilduff, Senior Attorney
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
(202) 780-8862
ckilduff@biologicaldiversity.org

*Attorney for Plaintiffs/Appellants*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................ i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS ........................................................ iv

TABLE OF AUTHORITIES ................................................... vii

GLOSSARY ................................................................. xii

STATEMENT OF JURISDICTION .............................................. 1

STATUTES AND REGULATIONS .............................................. 1

ISSUES PRESENTED ....................................................... 1

STATEMENT OF THE CASE ................................................. 3

    I.    Factual Background ................................................ 3

        A.    The Corps' proposal to dredge San Juan Harbor ................ 3

        B.    The agencies' analysis of the project's impacts. ............. 5

            1.    Impacts to environmental justice communities ............... 5

            2.    Impacts to threatened corals ............................ 6

    II.    Proceedings Below ................................................ 8

SUMMARY OF THE ARGUMENT ............................................. 8

ARGUMENT ............................................................... 11

    I.    Standard of Review .............................................. 11

II.     The Corps failed to consider and evaluate the connected action
        of LNG development in the Environmental Assessment. ...................12

III.    The Corps failed to consider the cumulative impacts of all past,
        present, and reasonably foreseeable future actions in the San
        Juan Harbor Environmental Assessment. .............................................17

        A.      The Corps' summary discussion of cumulative impacts in
                the Environmental Assessment fails to satisfy this Court's
                five-part test. .............................................................................18

        B.      The Corps arbitrarily failed to include the Authority's
                planned LNG development in San Juan Harbor in its
                cumulative impacts analysis. .....................................................22

IV.     The Corps failed to provide a reasoned environmental justice
        analysis in the Environmental Assessment. .........................................25

        A.      The Corps was required to identify the local communities
                that would be adversely impacted by the dredging
                project, including from the resulting larger tankers
                and infrastructure. .....................................................................26

        B.      The Corps failed to effectively disclose all expected
                impacts to local communities.....................................................28

        C.      The Corps' New 2023 Map Cannot Defend Its
                2018 Decision ............................................................................31

V.      The Corps' finding of insignificant impacts to ESA-listed
        corals in the Environmental Assessment is arbitrary and
        capricious..............................................................................................32

        A.      The Corps' Assessment ignored scientific information
                on the dredging project's harms to listed corals. .....................33

        B.      The Corps unlawfully relied upon post-approval
                coral surveys. .............................................................................34

C.      The Corps unlawfully relied upon uncertain
mitigation measures. ....................................................37

VI.    The Service violated the ESA in reaching its "not likely
to adversely affect" determination for listed coral species. ...............39

A.     The ESA requires formal consultation if a proposed project
may adversely impact listed species or critical habitat............39

B.     The Service's Determination is unsupported by the
record and the best available science ........................................41

C.     The Service cannot rely on uncertain mitigation
measures to find project is not likely to adversely
affect threatened corals. ...........................................46

VII.   The Corps' and Service's decisions should be vacated......................49

CONCLUSION .................................................................................50

CERTIFICATE OF COMPLIANCE.........................................................52

CERTIFICATE OF SERVICE .................................................................52

STATUTORY AND REGULATORY ADDENDUM ...............................Ai

# TABLE OF AUTHORITIES*

## Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ............................................................................49

*Am. Rivers & Ala. Rivers All. v. FERC,*
   895 F.3d 32 (D.C. Cir. 2018) ...............................................................................34

*Calcutt v. FDIC,*
   143 S. Ct. 1317 (2023) .........................................................................................32

*Camp v. Pitta,*
   411 U.S. 138 (1973) .............................................................................................44

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice,*
   No. 95-1702-GK, 1995 WL 748246 (D.D.C., Dec. 8, 1995) ..............................13

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) .............................................................................................44

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .............................................................................42

* *Ctr. for Biological Diversity v. Bernhardt,*
   982 F.3d 723 (9th Cir. 2020) ........................................................................ 46, 47

*Ctr. for Biological Diversity v. EPA,*
   861 F.3d 174 (D.C. Cir. 2017) .............................................................................40

*Ctr. for Biological Diversity v. FERC,*
   67 F.4th 1176 (D.C. Cir. 2023).............................................................................8

*Ctr. for Biological Diversity v. Forest Serv.,*
   444 F.Supp.3d 832 (S.D. Ohio 2020) ..................................................................45

*Ctr. for Biological Diversity v. Rumsfeld,*
   198 F. Supp. 2d 1139 (D. Ariz. 2002) ..................................................................48

*Ctr. for Biological Diversity v. Salazar*,
    804 F. Supp. 2d 987 (D. Ariz. 2011) ...................................................46

*Del. Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) ............................................ 9, 12, 18, 20, 21, 22

*Dep't of Transp v. Public Citizen*,
    541 U.S. 752 (2004) ...............................................................................29

*Eagle County v. Surface Transp. Bd.*, No. 22-1019,
    2023 WL 5313815 (D.C. Cir., Aug. 18, 2023) ................................. 17, 23, 24, 25

*FCC v. Fox TV Stations, Inc.*,
    556 U.S. 502 (2009) ...............................................................................43

*Friends of Buckingham v. State Air Pollution Control Bd.*,
    947 F.3d 68 (4th Cir. 2020) ....................................................................29

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
    80 F. Supp. 2d 1137 (W.D. Wash. 2000) ...............................................42

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021) ......................................................................41

*LaFlamme v. FERC*,
    852 F.2d 389 (9th Cir. 1998) ..................................................................35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................11, 44, 45

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015) ..............................................................12

* *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ................................................... 34, 35, 36

*Nat. Res. Def. Council v. Kempthorne*,
    506 F. Supp. 2d 322 (E.D. Cal. 2007) ....................................................45

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*,
   685 F.2d 459 (D.C.Cir. 1982), *vacated on other grounds sub nom.*
   *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983)................29

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) ...............................................................38

*Nat'l Parks Conservation Ass'n v. Jewell*,
   62 F. Supp. 3d 7 (D.D.C. 2014) .................................................. 45, 50

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ...............................................................46

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   839 F. Supp. 2d 1117 (D. Or. 2011) ......................................................46

*O'Reilly v. U.S. Army Corps of Eng'rs*,
   477 F.3d 225 (5th Cir. 2007) ...............................................................38

*Pub. Emps. for Env't Resp. v. Hopper*,
   827 F.3d 1077 (D.C. Cir. 2016) ..................................... 12, 31, 36, 37

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)............................................................................37

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)............................................................................32

*Sierra Club v. FERC*,
   38 F.4th 220 (D.C. Cir. 2022) ...................................................... 18, 22

*Sierra Club v. FERC*,
   827 F.3d 36 (D.C. Cir. 2016) ...................................................... 18, 19

*Sierra Club v. Sigler*,
   695 F.2d 957 (5th Cir. 1983) ...............................................................16

*Sierra Club v. U.S. Dep't of Energy*,
   867 F.3d 189 (D.C. Cir. 2017) ..............................................................11

ix

*Sierra Club v. Van Antwerp*,
  661 F.3d 1147 (D.C. Cir. 2011)........................................................42

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021).................................................. 49, 50

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) .................................................11, 12

* *Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
  6 F.4th 1321 (D.C. Cir. 2021) .................................................. 28, 30

**Statutes**

16 U.S.C. § 1536(a)(2)........................................................... 7, 39

16 U.S.C. § 1536(b)..................................................................40

16 U.S.C. § 1540(g)....................................................................1

28 U.S.C. § 1291.......................................................................1

28 U.S.C. § 1331.......................................................................1

42 U.S.C. § 4332(2)(C)........................................................... 3, 20

5 U.S.C. § 706(2)(A)............................................................ 12, 49

**Regulations**

40 C.F.R § 1501.4 ....................................................................11

40 C.F.R. § 1500.1(b)........................................................... 31, 33

* 40 C.F.R. § 1508.25(a)............................................................12

* 40 C.F.R. § 1508.25(a)(1) ................................... 8, 12, 13, 17, 25

\* 40 C.F.R. § 1508.25(a)(1)(ii) .................................................................13

\* 40 C.F.R. § 1508.7 ............................................... 9, 10, 18, 20, 22, 25

40 C.F.R. § 1508.8 ...............................................................................20

40 C.F.R. § 1508.8(b) ...................................................................... 24, 25

50 C.F.R. § 402.12 ...............................................................................39

50 C.F.R. § 402.12(d) ...........................................................................39

50 C.F.R. § 402.14(b) ...........................................................................40

50 C.F.R. § 402.14(b)(1) .........................................................................7

## Other Authorities

Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994) ..................30

FEMA, Hurricanes Irma and Maria in Puerto Rico (2018),
    https://www.fema.gov/sites/default/files/2020-07/mat-report_hurricane-irma-
    maria-puerto-rico_2.pdf .........................................................................5

Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species
    Consultation Handbook (1998),
    https://www.fws.gov/sites/default/files/documents/endangered-species-
    consultation-handbook.pdf ....................................................................40

\* Authorities upon which Appellants chiefly rely are marked with asterisks pursuant to D.C. Circuit Rule 28(a)(2).

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Authority | Puerto Rico Electric Power Authority |
| Consultation Handbook | Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook (1998) |
| Corps | U.S. Army Corps of Engineers |
| Determination | National Marine Fisheries Service's 2018 Not Likely to Adversely Affect Determination for Threatened Corals |
| El Puente | Plaintiffs-Appellants El Puente de Williamsburg, CORALations, and Center for Biological Diversity |
| Environmental Assessment or Assessment | U.S. Army Corps of Engineers' August 2018 Integrated Feasibility Report and Environmental Assessment for the San Juan Harbor Dredging Project |
| ESA | Endangered Species Act |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| Service | National Marine Fisheries Service |

## STATEMENT OF JURISDICTION

The Appellants El Puente, CORALations, and Center for Biological Diversity (collectively, "El Puente") appeal the district court's July 24, 2023, Order and Memorandum Opinion denying Plaintiffs' motion for summary judgment and granting Defendants' motion for summary judgment. The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 16 U.S.C. § 1540(g) (Endangered Species Act citizen suit provision). El Puente timely filed its notice of appeal on August 21, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.[1]

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an Addendum attached to the end of this brief.

## ISSUES PRESENTED

(1)    Under the National Environmental Policy Act ("NEPA"), "connected actions" must be discussed together in the same environmental assessment, and actions are considered connected if they cannot proceed unless other actions are

---

[1] El Puente's standing, which was not challenged in the district court, is established through declarations demonstrating concrete interests in the area and species affected by the challenged dredging project. *See, e.g.* Cintrón Moscoso Decl. ¶¶ 11–16, 26–33, ECF No. 20–2; Gonzalez García Decl. ¶¶ 4–8, 10–11, ECF No. 20-5; Lucking Decl. ¶¶ 10, 17, ECF No. 20-6; Rivera-Collazo Decl. ¶¶ 8, 21, ECF No. 20-8; Villaverde Decl. ¶¶ 8–10, 22–23, ECF No. 20-8.

1

taken previously or simultaneously. The Puerto Rico Electric Power Authority ("Authority") plans to convert the two power plants in San Juan Harbor to liquefied natural gas ("LNG") but cannot do so without the dredging project. Did the U.S. Army Corps of Engineers ("Corps") violate NEPA by not considering the dredging project together with the LNG conversion and development in the San Juan Harbor Environmental Assessment?

(2)     Under NEPA, the Corps must consider "cumulative impacts" within an environmental assessment, which must include all past, present, and reasonably foreseeable future actions. There are other actions in and around San Juan Harbor, including the reasonably foreseeable development of LNG infrastructure. Did the Corps violate NEPA by not including these other actions in its cumulative impacts analysis?

(3)     Under NEPA, the Corps' environmental justice analysis must identify potentially affected environmental justice communities and disclose the expected environmental impacts to these communities. The Corps limited its environmental justice analysis to impacts within a mile radius of the San Juan Peninsula, covering only a portion of the dredging footprint. Did the Corps violate NEPA by not identifying the environmental justice communities adjacent to the dredging project or disclosing its environmental effects to those communities?

(4)    In assessing the impacts of the dredging project on threatened corals, did the Corps violate NEPA by overlooking science about dredging impacts, failing to identify where corals exist, and relying on uncertain mitigation measures to reach a Finding of No Significant Impact?

(5)    The Endangered Species Act ("ESA") required the Corps to consult with the National Marine Fisheries Service ("Service") regarding impacts to threatened corals. The Service found the dredging project was "not likely to adversely affect" threatened corals, a decision only applicable when effects are extremely unlikely to occur. Did the Service violate the ESA by making a Determination that is unsupported by the record and best available science, and that relied on uncertain mitigation measures to prevent harm?

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    The Corps' proposal to dredge San Juan Harbor

NEPA requires the preparation of an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In 2015, the Corps announced its intent to prepare an environmental impact statement for its proposed plan to significantly deepen and widen channels in San Juan Harbor, Puerto Rico. JA989.

3

Bordering San Juan Harbor, which is Puerto Rico's largest port, are densely populated neighborhoods in Old San Juan, Guaynabo, and Cataño. JA134, JA148. Also nearby are two power plants primarily burning diesel fuel: the San Juan Power Plant (near Guaynabo) and the Palo Seco Power Plant (near Cataño). JA134. The Authority scheduled these power plants to retire or be of limited use to comply with the U.S. Environmental Protection Agency's mercury and air toxics standards. JA992.

A primary purpose of the Corps' dredging project is to allow the import of oil and LNG on large tankers into San Juan Harbor. JA57. The project would thereby enable the Authority to convert its two power plants to LNG rather than retiring them. This could lock in decades of continued fossil fuel use and pollution for local communities.

The Corps changed course without explanation, and instead of preparing an environmental impact statement for the project, prepared a less-detailed environmental assessment. In August 2017, it released the draft environmental assessment for public review. JA241. The local communities' ability to comment was inhibited due to the preparation for and arrival of Category 5 Hurricane Irma on September 6, 2017. Hurricane Maria hit two weeks later. The hurricanes caused widespread death and destruction as well as electrical and telecommunication

4

blackouts; food and water shortages; and flooding and landslides.[2] The Corps knew

there was a "life and death crisis" and limited communications/electricity, and it

was asked about "a reasonable extension … so that all stakeholders have equal and

fair opportunity for comment." JA436. Nonetheless, the Corps did not extend the

comment period and finalized the Environmental Assessment less than a year later.

*See, e.g.,* JA61 ("SETTING THE PACE"); JA972 (emphasizing the compressed

schedule). The Corps issued a "Finding of No Significant Impact" for the project

on November 5, 2018. JA54–56.

    B.    <u>The agencies' analysis of the project's impacts.</u>

The record demonstrates the connection between the dredging project and

LNG development in the Harbor, and the Corps' Assessment incorporated the

resulting LNG development in the project's economic analysis. JA279–82.

However, the Corps did not consider the adverse environmental consequences of

this LNG development.

    1.    *Impacts to environmental justice communities*

The Assessment included a rudimentary environmental justice analysis for

an area within a one-mile radius near Old San Juan. JA273. The Corps determined

this area was majority White and included fewer racial minorities than the San

---

[2] FEMA, Hurricanes Irma and Maria in Puerto Rico 1-2 to 1-11 (2018),
https://www.fema.gov/sites/default/files/2020-07/mat-report_hurricane-irma-
maria-puerto-rico_2.pdf.

Juan Municipality as a whole. JA274. It also omitted affected environmental justice communities southwest of the dredging footprint, including Sabana, Vietnam, Amelia (collectively, "Guaynabo") and Cataño. Guaynabo and Cataño have poor air quality due to "pollution from power plants, industrial facilities, motor vehicles, and major San Juan emitters." JA134. Yet the Assessment concluded the project "would not be expected to cause disproportionately high and adverse effects on any minority or low income populations." JA274.

Nearly five years later, after the filing of this litigation (and just before the deadline for El Puente's opening brief in district court), the Corps effectively conceded these deficiencies by publishing a Supplemental Environmental Assessment, which recognized the evaluation of affected environmental justice communities should have extended five miles. JA1155.

## 2. *Impacts to threatened corals*

Corals, including seven species that are listed as threatened under the ESA, fringe the mouth of San Juan Bay and form a barrier reef along the north shore. JA79. Coral reefs are "one of the most important and biologically diverse ecosystems on Earth," protect coastlines against erosion from storms and sea-level rise, and support fisheries and businesses through tourism and recreation. JA434. Corals are imperiled by myriad threats including habitat destruction, pollution, overfishing, disease, and ocean warming. *Id*. Elkhorn coral, Puerto Rico's

6

dominant reef-building coral, has declined more than 90 percent since the 1980s. JA1042.

Against this backdrop, the Corps plans to dredge 2.2 million cubic yards of seafloor to dump it two miles offshore, JA179, traveling over ESA-listed corals and their critical habitat. JA79. The Corps will transport the dredged material with barges or "scows," which will leak a slurry of sediment into the water. JA217. Dredging and the disposal of dredged material comprise "the most well-known sources" of sediment that kills and smothers corals, JA1300, yet the Corps' Assessment found harm to threatened corals would be insignificant with the implementation of yet-to-be determined mitigation measures. JA216–17.

Section 7 of the ESA required the Corps to consult with the Service to "insure" the dredging project is "not likely to jeopardize the continued existence" of ESA-listed species or "result in the destruction or adverse modification" of a species' critical habitat. 16 U.S.C. § 1536(a)(2). Here, for the project's impacts on threatened corals, the Corps and Service only engaged in "informal" consultation—thus avoiding the Service's preparation of a biological opinion— which is permissible only when the Service concurs an action is "not likely to adversely affect" the listed species or critical habitat. 50 C.F.R. § 402.14(b)(1). The Service based its "not likely to adversely affect" Determination ("Determination")

on unspecified mitigation measures to be implemented if turbidity exceeds a particular threshold. JA1186–87.

## II.    Proceedings Below

El Puente filed its complaint in the district court on August 16, 2022. JA7–53. The parties filed cross-motions for summary judgment, and on July 24, 2023, the district court issued its Order (JA1305) and Memorandum Opinion (JA1306–36) denying El Puente's motion and granting the Corps' cross-motion. El Puente filed its notice of appeal on August 21, 2023. Because the dredging work is scheduled to begin on January 2, 2024, the parties filed a joint motion for an expedited briefing schedule (Doc. 2105986), which the Court granted on September 12, 2023 (Doc. 2016401).

## SUMMARY OF THE ARGUMENT

NEPA requires agencies to consider "connected actions" within the same environmental assessment and defines connected actions to include those that "cannot or will not proceed unless other actions are taken previously or simultaneously."  40 C.F.R. § 1508.25(a)(1).[3]  The Puerto Rico Electric Power Authority notified the Corps throughout the NEPA process that (1) the Authority

---

[3] The Council on Environmental Quality amended the NEPA regulations, but those amendments took effect after the Corps issued the decision at issue in this case. Throughout this brief, El Puente cites to the NEPA regulations that were in effect at the time of the challenged decision (2018). *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 n. 2 (D.C. Cir. 2023).

planned to proceed with LNG conversion and development at its power plants in

San Juan Harbor; and (2) this LNG development could not proceed without the

dredging project due to the size of LNG tankers. The Authority's planned LNG

conversion and development, which is subject to federal review and approval, and

the Corps' dredging project, qualify as connected actions under NEPA. The Corps,

however, failed to consider the environmental consequences of the LNG

development in the Environmental Assessment.

NEPA requires agencies to evaluate the "cumulative impacts" of proposed

projects. 40 C.F.R. § 1508.7. To analyze whether agencies have taken a hard look

at cumulative impacts, this Court has required agencies to identify the area for

which effects will be felt; identify the past, present, and reasonably foreseeable

future actions in the affected area; and evaluate the overall cumulative impacts.

*Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (citation

omitted). The Corps' cumulative impacts analysis fails this test, as the Corps failed

to identify the affected area; identify all past, present, and future actions in the

area; and evaluate the overall impacts. *Id*.

One of the actions the Corps failed to include in its cumulative impacts

analysis is the Authority's planned LNG conversion and development. The Corps

acknowledged the Authority's transition to LNG "is a reasonable future

assumption" (JA191), but it failed to include it as a "reasonably foreseeable" future

9

action within its evaluation of cumulative impacts. Even if the Corps could justify refusing to consider LNG development as a "connected action" (which it could not), the failure to consider the environmental consequences of this LNG development, as part of its cumulative impacts analysis, violated NEPA. 40 C.F.R. § 1508.7.

NEPA requires the Corps identify potentially affected environmental justice communities and disclose the anticipated environmental impacts on these communities. The Corps violated NEPA by publishing an environmental justice analysis limited to a one-mile radius buffer despite the footprint and the impacts of the project being larger. It thus omitted overburdened and low-income communities that will be most affected. The Corps also failed to disclose impacts to these environmental justice communities—such as the potential concentration of pollutants or risk of bigger oil spills from larger tankers—because it did not provide a Spanish translation of the Assessment and did not extend the comment period after the hurricanes. Finally, the Corps' attempt to fix its environmental justice analysis by publishing an expanded 5-mile buffer in 2023 cannot succeed, as NEPA requires the Corps consider and disclose impacts before making a decision.

NEPA requires agencies to evaluate impacts to species that are listed as threatened or endangered under the ESA. If those impacts may be "significant," the

agency must prepare an environmental impact statement. 40 C.F.R. § 1501.4. The Corp's finding of insignificant impacts to listed corals is arbitrary and capricious because it failed to adequately assess impacts and relied on uncertain mitigation measures.

The ESA requires the preparation of a biological opinion if a project's impacts are likely to adversely affect listed species. The Service's Determination that the dredging project will not likely adversely impact listed corals is unlawful because it is unsupported by the best scientific information available and relied on uncertain mitigation measures.

## ARGUMENT

## I.    Standard of Review

For El Puente's NEPA claims, the Court must ensure the Corps "adequately considered and disclosed the environmental impact[s] of its action[ ] and that its decision is not arbitrary and capricious." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017) (citation omitted). "[T]he arbitrary and capricious standard demands that the agency 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983)). The Court owes

11

no deference to the Corps' interpretation of NEPA, as NEPA is primarily administered by the Council on Environmental Quality. *United Keetoowah*, 933 F.3d at 738.

For El Puente's ESA claim, the standard of review is also provided in the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A) (requiring courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *see Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1088 (D.C. Cir. 2016) (reviewing action under ESA for whether it is "arbitrary and capricious because it is not based on the best available scientific data").

## II.    The Corps failed to consider and evaluate the connected action of LNG development in the Environmental Assessment.

The NEPA regulations "dictate the appropriate scope of a NEPA document." *Del. Riverkeeper*, 753 F.3d at 1313. Agencies must "include 'connected actions,' 'cumulative actions,' and 'similar actions' in an Environmental Assessment." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (citing 40 C.F.R. § 1508.25(a)). "Connected actions" are those that "are closely related and therefore should be discussed in the same [assessment]." 40 C.F.R. § 1508.25(a)(1). "Actions are connected if they (1) [a]utomatically trigger other actions … (2) [c]annot or will not proceed unless other actions are taken previously or simultaneously[,] or (3) [a]re interdependent parts of a larger action

12

and depend on the larger action for their justification." *Id*. The dredging project is connected to planned LNG development in the same Harbor, but the Corps failed to consider the environmental impacts of LNG development in the Environmental Assessment.

The record demonstrates LNG development in San Juan Harbor is being planned but "cannot or will not proceed" unless the dredging project occurs. Thus, the dredging project and LNG development are connected actions. 40 C.F.R. § 1508.25(a)(1)(ii); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-1702-GK, 1995 WL 748246, at *8 (D.D.C., Dec. 8, 1995) (the two actions "need only meet one of the three tests to qualify as 'connected actions.'"). Most of the world's fleet of LNG tankers are too large to access the Harbor without dredging and widening. *See* JA155. Thus, the planned LNG development cannot (and will not) occur without the dredging project. *Id*.

The Corps was aware of this connection throughout the NEPA process. During the "scoping" period in 2015, the Puerto Rico Shipping Association notified the Corps that "the necessity of the Island of Puerto Rico to bring alternative type of fuels such as LNG" required the deeper dredging of the Port. JA298. Similarly, the Authority explained to the Corps that the use of natural gas in Puerto Rico "requires the construction of an LNG receiving, storage and re-gasifying infrastructure, and the dredge of the navigational channels within the San

13

Juan Harbor, in order for it to have the required depth for the LNG Carriers."
JA300. The Authority further explained its "preferred option" includes an LNG
receiving terminal in the Harbor, which requires a channel up to 40.2 feet deep and
400 feet wide. JA301. "Due to the need of this infrastructure, it is important that
these specifications are considered for the proposed Project." *Id*. Yet while the
Corps relied on these specifications in developing the dredging project, it ignored
the environmental impacts of the connected LNG development.

In 2017, in response to a question from the Corps asking whether the
dredging project was required for the Authority to convert its San Juan area power
plants to LNG, the Authority responded:

> The Federal Navigation Project, which includes the Army terminal
> widening and deepening, *is of outmost* [sic] *importance and hence
> required* for both permitting and the cost benefit of this project to our
> end customers ….

JA411 (emphasis added). Indeed, the Corps had assumed, in asking these
questions, the LNG infrastructure "will ONLY take place in the case that a federal
navigation project is constructed." JA409.

In a January 2018 letter to the Corps, the Authority confirmed the dredging
and LNG projects were being planned for construction around the same time and
both required federal approvals. JA328. According to the Authority, its planned
LNG terminal "is key to comply" with federal air quality requirements. *Id*. Thus,
the Authority notified the Corps it would submit its LNG project to the Federal

Energy Regulatory Commission for approval. *Id*. The Authority again emphasized the critical connection between the two projects, confirming the dredging project was required for the LNG project. JA330. By January 2018, the Corps' maps identified that specific components of its dredging project were specifically intended for LNG development. JA333 (map showing the Corps was widening the Army Terminal Channel "for LR2 Tankers and LNG Vessels").

Thus, while the Corps was preparing the Assessment for the dredging project, it was clear the planned LNG development in the Harbor required the dredging project, and the Authority was moving forward with the required federal permitting and approval on the assumption the dredging would be designed to allow for the development. The Corps, however, failed to consider the resulting environmental impacts in the Assessment. These impacts may include noise, light, and air pollution; dock construction injuring or killing corals and mangroves; and the risk and effects of hazardous incidents such as vapor clouds and fires at the LNG terminal. *See, e.g.,* JA1003–21 (evaluation by environmental firm with significant LNG experience, noting the project "is a high footprint endeavor" that will garner scrutiny "because of its localized impact."). In any event, the Corps was obligated to at least consider these environmental impacts in its Assessment.

Indeed, the Corps accounted for the economic benefits of LNG development in its Assessment, even while ignoring the environmental consequences. The Corps

15

noted, for instance, the "benefits attributable to the Recommended Plan" included "power generation cost reduction" with LNG conversion. JA77. If, as the Corps recognized, the economic benefits of dredging and LNG development are sufficiently interconnected to be considered in one Assessment, then the same should be true of the resulting environmental impacts. *See Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (holding, in a NEPA challenge to a similar dredging project, "[t]he Corps cannot tip the scales … by promoting possible benefits while ignoring their costs.").

Despite the constant interaction between the Corps and Authority throughout the NEPA process, the district court found Puerto Rico's conversion to LNG is uncertain. JA1327. However, on the same page of the Assessment cited by the court, the Corps concluded the transition to LNG was a reasonable assumption:

> [A] conversion to LNG is assumed to occur only if a Federal navigation project, including widening of Army Terminal Channel, is constructed due to width limitations of the existing channel prevents the larger, more economical, and readily available in the world fleet LNG vessels from calling on San Juan. Based on input from the [the Authority], the relatively low price of LNG compared to diesel, and the widespread use of LNG in power generation across the world, it seems that *a transition to LNG is a reasonable future assumption*.

16

JA191 (emphasis added). The Corps further stated, "[p]er conversations with [the Authority], the utility authority still plans to convert the San Juan area power plants to LNG post-Hurricanes Irma and Maria." JA179.[4]

The Authority's planned LNG development in the Harbor cannot proceed without the dredging project, and the Corps' failure to consider the environmental impacts of this connected action in the Assessment violated NEPA. 40 C.F.R. § 1508.25(a)(1).

## III. The Corps failed to consider the cumulative impacts of all past, present, and reasonably foreseeable future actions in the San Juan Harbor Environmental Assessment.

NEPA requires federal agencies to evaluate the cumulative impacts of a proposed project, along with the project's direct and indirect impacts. *Eagle County v. Surface Transp. Bd.*, No. 22-1019, 2023 WL 5313815, at *10 (D.C. Cir., Aug. 18, 2023) (citation omitted). Cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40

---

[4] While the Corps argued in the district court that El Puente waived this issue by not raising it administratively, this issue was directly before the Corps throughout the administrative process, with the Authority repeatedly notifying the Corps that it needed the dredging project to proceed with its planned LNG development. Additionally, an attorney for environmental and community groups attended the Corps' public hearing in August 2017 (JA617) and subsequently provided the agency with documents "concerning LNG deliveries to Puerto Rico." JA449–582.

C.F.R. § 1508.7. The dredging project's Environmental Assessment fails to meet this NEPA requirement.

A.    The Corps' summary discussion of cumulative impacts in the Environmental Assessment fails to satisfy this Court's five-part test.

This Court has set forth a five-part test agencies must meet to satisfy NEPA's cumulative impacts requirement:

> [A] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Del. Riverkeeper*, 753 F.3d at 1319. The Corps' meager, summary discussion of cumulative impacts in the Assessment fails to satisfy this test.

First, the Corps' cumulative impacts analysis failed to identify the area in which effects will be felt. "[A]n agency can typically identify the location where cumulative impacts are likely to occur by first choosing a single 'ecoregion' or 'watershed.'" *Sierra Club v. FERC*, 38 F.4th 220, 233– 34 (D.C. Cir. 2022) [hereinafter *Sierra Club I*] (citation omitted); *see also Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016) [hereinafter *Sierra Club II*] (where the agency "identified the relevant geographic area for its cumulative-impact analysis as

18

Brazoria County."). Here, no location is identified in the Corps' discussion of cumulative impacts. JA227–28.

Second, the Corps failed to identify all past, present, proposed, and reasonably foreseeable future actions that have had or are expected to have impacts in the same area. *Compare id.*, *with Sierra Club II*, 827 F.3d at 49 (the agency catalogued the other actions in the area, "including industrial, port and harbor channel, pipeline, oil and gas field, land and air transportation, commercial, residential, and other miscellaneous developments."). In fact, the Corps failed to identify *any* past projects in its cumulative impacts analysis (JA227–28) even though there is a history of projects adversely impacting San Juan Bay. *See e.g.*, JA1022–62 (biological assessment of a past project included dredging and construction of a new pier and access trestle in San Juan Harbor). The Corps also failed to identify any present or proposed actions, except for the Coast Guard's plans to move buoys and expand Anchorage F. JA228. And no reasonably foreseeable future actions are identified. JA227–28.

Third, the Corps failed to analyze the expected impacts of all past, present, and reasonably foreseeable actions, or the overall impact if all individual impacts are allowed to accumulate. *Id*. The Corps' limited cumulative impacts analysis within the Assessment therefore fails this Court's five-part test and violates NEPA.

19

*Del. Riverkeeper*, 753 F.3d at 1319; 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8.

Rather than conducting the required cumulative impacts analysis, the Corps relied on two general conclusions in the Assessment. First, that "[p]otential cumulative impacts on many resources were considered as part of this study and the majority of these resources were determined to have little risk of being cumulatively impacted." JA228. However, considering potential impacts to resources without first identifying the past, present, and reasonably foreseeable future actions is both backwards and meaningless.

Unsurprisingly, the Corps reached the wrong conclusion, as there are other planned activities that may impact the same resources that will be impacted by the dredging project. For instance, in 2015 the Authority evaluated infrastructure options to deliver natural gas to the Authority's two power plants in and near San Juan Harbor. JA993–1021. The Authority consulted with an energy advisor firm, which "determined that the environmental issues that are most likely to result in a high consequence impacts [sic] are those impacting coral reefs and mangroves." JA1003. It concluded this is a "high footprint endeavor that will in all likelihood garner additional scrutiny because of its localized impact (dredging, large tanks, large vessels delivery LNG)." JA1021.

20

The Corps' second summary conclusion in the Assessment was that the "net contribution" to cumulative impacts will be "appropriately minimized" due to efforts to avoid and minimize impacts, and federal and state permitting requirements. JA228. This conclusion, on which the district court relied (JA1332), is also flawed. If agencies can avoid analyzing cumulative impacts merely by relying on unspecified mitigation and permitting requirements for any undisclosed projects, NEPA's long-standing cumulative impacts requirement will be eviscerated, as there will nearly always be mitigation and permitting requirements for other present and future projects. The Corps' approach would allow agencies to consider each project in isolation within the permitting process for that single project, and thereby never consider the overall cumulative impacts of all past, present, and reasonably foreseeable projects in the analysis area, as NEPA requires. No exception allows the Corps to ignore other projects in the same area that may require mitigation and separate permitting, as that exception would swallow the rule.

The only other reason the district court upheld the Corps' cumulative impacts analysis is because the Corps considered the Coast Guard's plan for the expansion of Anchorage Area F. JA1332. But simply including one paragraph devoted to one other project is not enough and falls far short of the five-part test for a cumulative impacts analysis. *Del. Riverkeeper*, 753 F.3d at 1319. The

21

summary conclusions the Corps provided in the Assessment, along with its brief

mention of Anchorage F and plans to move buoys (JA228), simply cannot be

squared with NEPA's requirement of a detailed cumulative impacts analysis. *Id.*; 40

C.F.R. § 1508.7.

In sum, "[w]here an agency pays scant attention to past actions that have

damaged the geographic area at issue or discusses cumulative impacts in

conclusory phrases, it has not met NEPA's standard." *Sierra Club I*, 38 F.4th at

233 (citations omitted).

B.    The Corps arbitrarily failed to include the Authority's planned LNG development in San Juan Harbor in its cumulative impacts analysis.

As discussed, the Corps failed to consider in its NEPA analysis the impacts

associated with the Authority's planned LNG development in San Juan Harbor.

Although these impacts should have been considered interconnected, for the

reasons set forth previously, *supra* at Section II, at the very least they are

cumulative impacts the Corps was required to consider in the Assessment. The

LNG development was reasonably foreseeable when the Assessment was prepared,

as the Authority notified the Corps of its plans for LNG development throughout

the NEPA process. Section II, *supra*. Indeed, the Corps acknowledged "a transition

to LNG *is a reasonable future assumption*" based on input from the Authority, the

relatively low price of LNG, and the widespread global use of LNG. JA191

22

(emphasis added). The Authority's LNG development, however, is not even mentioned in the cumulative impacts analysis.

"In determining what effects are 'reasonably foreseeable,' an agency must engage in 'reasonable forecasting and speculation,' with *reasonable* being the operative word." *Eagle County*, 2023 WL 5313815, at *13 (citation omitted). While the agency "need not foresee the unforeseeable," it cannot avoid considering relevant effects simply because doing so "involves some degree of forecasting." *Id*. (citation omitted). The Corps did forecast here and found LNG development was "a reasonable future assumption." JA191. And as explained above, it is undisputed this LNG development could not occur without the dredging project. Even if the Corps could somehow justify failing to address LNG development as an interrelated effect (which it could not), the complete failure to consider the resulting environmental impacts in the cumulative impacts analysis violated NEPA. *Eagle County*, 2023 WL 5313815, at *10.

In *Eagle County*, petitioners challenged the construction and operation of a new rail line in Utah's Uinta Basin. 2023 WL 5313815. Petitioners challenged the Transportation Surface Board's cumulative impacts analysis, which had considered 27 relevant projects but not the downstream impacts of increased oil refining along the Gulf Coast. *Id*. at *11–12. This Court held the Board failed to adequately explain why it could not employ "some degree of forecasting" to identify the

23

downstream impacts. *Id*. at *14. Significantly, the Court found the Board could not avoid its NEPA responsibility to identify the effects of increased oil drilling and refining "on the ground that it lacks authority to prevent, control, or mitigate those developments."  *Id*. at *15 (citation omitted).

The purpose of the railway in *Eagle County* was to increase oil production in the Uinta Basin, which would be transported to Gulf Coast refineries, and the Board was not excused from considering these downstream impacts—including effects "on Gulf Coast communities of refining the oil"—even where it lacked jurisdiction over the producer or distributor of the oil transported by the railway. *Id*. at **15, 26 (citation omitted). Similarly, here, the ability to transport LNG into San Juan Harbor was an explicit purpose of the dredging project (JA75), and the Corps was required to consider the reasonably foreseeable impacts of the resulting LNG development in its cumulative effects analysis.

The Corps similarly should have considered the environmental consequences of the planned LNG development in the Assessment as an "indirect" effect, which relies on the same "reasonably foreseeable" standard. 40 C.F.R. § 1508.8(b). Even though the Authority's LNG development may be "later in time," it will still be one of the major results of the dredging project, and as demonstrated, was reasonably foreseeable when the Corps prepared the

Assessment. *Id*.; *Eagle County*, 2023 WL 5313815, at \*16–18 (holding that agency failed to consider the indirect effects resulting from new railway).

Whether characterized as a connected action, cumulative impact, or indirect effect, the record demonstrates the Authority's planned LNG conversion and development in the Harbor was a primary purpose of the Corps' dredging project, completely dependent on the project, and reasonably foreseeable. The Corps therefore could not have complied with NEPA without taking a "hard look" at the environmental impacts of LNG development. The failure to consider and disclose the impacts of LNG development in conjunction with the dredging project violated NEPA. 40 C.F.R. §§ 1508.25(a)(1), 1508.7, 1508.8(b).

## IV.    The Corps failed to provide a reasoned environmental justice analysis in the Environmental Assessment.

NEPA requires disclosure of a project's reasonably foreseeable impacts to communities already overburdened by pollution. *Eagle County*, 2023 WL 5313815, at \*\*5, 12–15, 28. Here, the Environmental Assessment's environmental justice analysis violates NEPA for two interrelated reasons: it failed to (1) identify overburdened and impacted communities like those in Cataño and Guaynabo as environmental justice communities; and (2) assess and disclose the adverse impacts to these communities despite having sufficient information to do so.

25

A.    <u>The Corps was required to identify the local communities that would be adversely impacted by the dredging project, including from the resulting larger tankers and infrastructure.</u>

The Corps' environmental justice analysis was deficient because it arbitrarily used a one-mile radius area near the mouth of the Harbor and Old San Juan to assess impacts, yet this area failed to include even the entire project footprint. JA177, JA273 (Figures 1 and 2 below). The area also only includes communities with a majority White population, with fewer racial minorities than San Juan as a whole. JA274. This area was the basis for the Assessment's unsupported and arbitrary conclusion that the project would not be expected to cause "disproportionately high and adverse effects on any minority or low income populations." *Id*.



Figure 1. The Assessment's map of environmental justice commmunities of San Juan inside the green circle with a one-mile radius, JA273.



Figure 2. The dredging plan is outlined in white. JA177. The dredging area in the south was excluded from the circle in Figure 1.

In *Vecinos,* the agency examined a project's impacts within a two-mile radius of the project site despite its determination that environmental effects would extend beyond two miles. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021). This Court found no rational connection between the facts found and the decision made, so the decision to analyze the communities within only a two-mile radius was arbitrary. *Id.* at 1330–31.

The same is true here, as the Corps limited its disclosure of potential effects to environmental justice communities to a small circle not even encompassing the project. Significantly, the Municipality of Cataño was concerned the project would (1) increase the force of waves that would exacerbate coastal erosion, and (2) dredge up contaminants and diminish water quality, which would affect fishing. JA987 (letter in Spanish); JA973–76 (Corps meeting with Municipality of Cataño). Nonetheless, the Corps limited its environmental justice analysis to a one-mile area that excluded Cataño and other overburdened communities that will be affected. As in *Vecinos*, the Corps' environmental justice analysis in the Assessment should be found inadequate and in violation of NEPA.

B.    The Corps failed to effectively disclose all expected impacts to local communities.

Siting fossil-fuel terminals and other polluting facilities disproportionately in low-income communities and communities of color is a classic environmental

justice problem. *See Friends of Buckingham v. State Air Pollution Control Bd.*, 947

F.3d 68, 87 (4th Cir. 2020) ("Although the term 'environmental justice' is of fairly

recent vintage, the concept is not") (citation omitted). A primary purpose of the

dredging project is to allow larger tankers to access a terminal near the San Juan

Power Plant, near environmental justice communities. Despite this purpose, the

Corps failed to disclose all the expected adverse impacts in these areas, including

the potential concentration of pollutants and the risk of bigger oil spills from larger

tankers. *See e.g.,* JA241 (describing public concerns); JA443–45. This does not

provide the "hard look" NEPA requires.

      Moreover, by failing to provide a Spanish translation of the Assessment and

extend the comment period, the Corps violated the requirement to draft documents

in terms that "effectively … disclose" environmental impacts to its "intended

readership," including "interested members of the public." *Nat. Res. Def. Council*

*v. U.S. Nuclear Regul. Comm'n*, 685 F.2d 459, 487 n.149 (D.C.Cir. 1982), *vacated*

*on other grounds sub nom. Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462

U.S. 87 (1983); *Dep't of Transp v. Public Citizen*, 541 U.S. 752, 768 (2004)

(NEPA "guarantees that the relevant information will be made available to the

larger audience that may also play a role in both the decisionmaking process and

the implementation of that decision" (citation omitted)). Spanish is widely used in

Puerto Rico. *See* JA138 (history of Spanish colonization). Yet the Corps failed to

provide a Spanish translation of the Assessment after it was requested in August 2017. JA617 (request for materials in Spanish).

Further, the Corps did not extend the 30-day comment period on the Assessment after Hurricanes Irma and Maria, which left much of Puerto Rico without access to electricity, cell service, or passable roads. A commenter asked whether there would be "a reasonable extension … so that all stakeholders have equal and fair opportunity for comment." JA436. There is no evidence the Corps responded to this request. Thus, the Corps also failed to disclose the project's impacts at a time conducive to reaching Puerto Ricans.

The Corps could not properly assess impacts on environmental justice communities without specific efforts at including disproportionately impacted communities. The Executive Order requiring agencies to assess the environmental effects of their actions on environmental justice communities directs agencies to create strategies to ensure greater public participation and avoid excluding participation of disadvantaged populations. Exec. Order No. 12,898 at §§ 1-103, 2-2, 59 Fed. Reg. 7629 (Feb. 16, 1994).[5] The Corps' failure to meaningfully engage overburdened communities undermines the Assessment's analysis and disclosure of impacts.

---

[5] Although this Executive Order states it does not create a private right to judicial review (§ 6-609), this Court has considered it in a challenge to an agency's environmental justice analysis. *Vecinos*, 6 F.4th at 1330.

C.    <u>The Corps' New 2023 Map Cannot Defend Its 2018 Decision</u>.

The Corps' attempted to fix its environmental justice analysis with a final

Supplemental Assessment prepared in 2023, five years after the challenged

decision, and after the filing of this case. JA1154–60. This Supplement highlighted,

rather than cured, the NEPA violations in the 2018 Assessment. The Corps

belatedly considered environmental justice communities in a five-mile area instead

of a one-mile area around the project. JA1155. This included previously omitted

environmental justice communities in Cataño and Guaynabo. *Id*. The analysis

found in a 1-mile radius, 97 percent of the population were people of color, and in

a 5-mile radius, 99 percent were people of color. *Id*. Previously the Corps found 25

percent of people were people of color in the one-mile radius area. JA274. These

changes show the flaws in the Corps' earlier analysis, but cannot fix the

Assessment.

This Court cannot accept this post-hoc attempt to dodge basic NEPA and

APA requirements. First, NEPA requires agencies to consider the impacts of their

decisions *before* they are made to minimize the risk the agency will overlook

important effects only to discover them after the decision. *See Hopper*, 827 F.3d at

1082–83 (requiring data before construction); 40 C.F.R. § 1500.1(b). Second,

publishing the environmental justice analysis after the decision precluded the

affected public from meaningfully engaging with the Corps about possible

31

mitigation to avoid disparate impacts. *See, e.g.,* JA973–76 (proposal for a living

shoreline in Cataño). Third, it is a bedrock principle of administrative law that an

agency may not defend an administrative decision on new grounds not set forth in

its original decision. *E.g., Calcutt v. FDIC*, 143 S. Ct. 1317, 1321 (2023) (citing

*SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Thus, the Corps' 2023 post-hoc

environmental justice analysis underscores the Corps' failure to take the requisite

"hard look" when it issued the arbitrary environmental justice analysis in 2018.

## V.    The Corps' finding of insignificant impacts to ESA-listed corals in the Environmental Assessment is arbitrary and capricious.

The dredging project will harm corals by increasing sedimentation and

turbidity in San Juan Bay, which smothers corals and blocks sunlight, causing

death, starvation, disease, and stress. JA1186 (discussion on sedimentation impacts

in Determination); JA217 ("historical documentation from dredging projects for

the last 50-years show that all scows leak to some extent"). The Environmental

Assessment's finding of no significant impact to 7 ESA-listed species of corals is

arbitrary and capricious in three ways. First, the Corps failed to evaluate the best

available science on dredging impacts, including evidence that a similar dredging

project in Miami, Florida, recently resulted in significant and widespread harm to

coral. Second, the Corps did not evaluate adequate baseline data to assess the

impacts of the project to listed corals and their habitat. And finally, the Corps

unlawfully relied upon uncertain mitigation measures to find insignificant impacts.

A.    The Corps' Assessment ignored scientific information on the dredging project's harms to listed corals.

NEPA requires the Corps to use high quality, accurate scientific information to ensure the scientific integrity of its analysis. 40 C.F.R. § 1500.1(b). Here, the Corps failed that basic obligation in the Assessment by ignoring relevant information regarding a prior Corps dredging project in Miami. There, the Corps had also determined impacts to corals from sedimentation would be "insignificant." JA207. But that project killed hundreds of thousands of corals and impacted corals hundreds of meters from the dredging. JA1236. Instead of learning from its errors, the Corps again failed to take the hard look NEPA requires and performed another cursory analysis ignoring evidence that this project, like Miami, is likely to significantly harm listed corals.

The Corps' Assessment is silent about the mass coral die-off from the Miami project and the need to analyze impacts from dredging activities beyond a 150-meter "indirect impact zone." JA207. The Corps here was aware dredged material in Miami migrated hundreds of meters away from the dredging area, JA1241–98, and resulted in the death of coral, JA1237, but nowhere in the Assessment does it grapple with the lessons learned from Miami and the need to update its assumptions regarding the extent of dredging's harms.

Instead, the Corps here relied upon the Miami dredging project's ESA consultation, which concluded impacts to listed corals would be "insignificant"

33

because the corals occurred more than 150 meters away from the dredging area.

JA207. Numerous post-dredge surveys have demonstrated this assumption was in

error and impacts extended far beyond 150 meters. *See e.g.* JA1236, JA1241–98

(finding the Miami project resulted in impacts 700 meters from dredging channel).

Despite this information, the Corps relied upon a 150-meter zone of impact from

dredging and failed to examine impacts to corals beyond that perimeter. JA207.

The Corps' failure to take a hard look at the disastrous Miami experience before

approving the project violates NEPA. *See Am. Rivers & Ala. Rivers All. v. FERC*,

895 F.3d 32, 50–51 (D.C. Cir. 2018) (finding agency violated NEPA by failing to

take a hard look at available scientific information regarding a project's impacts to

fish).

   B.   The Corps unlawfully relied upon post-approval coral surveys.

   To ensure a proper NEPA analysis, agencies must examine the baseline data

on which it bases its environmental review. *N. Plains Res. Council, Inc. v. Surface

Transp. Bd*., 668 F.3d 1067, 1083 (9th Cir. 2011). "Such analyses must occur

before the proposed action is approved, not afterward." *Id.*

   Here, the Corps failed to evaluate data on listed coral near the mouth of San

Juan Harbor, as requested by the Service. JA1192 (noting the Biological

Assessment "does not provide any data or estimates of the number of ESA-listed

corals in the action area and states site-specific surveys have not been completed").

34

Instead, the Corps planned to conduct "pre-construction resource surveys" to identify listed corals that may be affected by sedimentation and turbidity resulting from leaking scows. JA217; JA1186 ("The [Corps] has not conducted resource surveys in these areas at this time but plans to do so prior to construction."). Once those corals are identified, the Corps says it will implement a yet-to-be-determined "turbidity monitoring plan" that contains "adaptive management measures" to mitigate turbidity. JA217. But NEPA does not envision post-approval surveys of ESA-listed species; instead, the agency must evaluate information on the baseline before approval of the project to ensure it adequately assesses the effects of the action. *See LaFlamme v. FERC*, 852 F.2d 389, 400 (9th Cir. 1998) ("[O]nce a project begins, the 'pre-project environment' becomes a thing of the past" and evaluation of the project's effect becomes "simply impossible.")

Other courts have found unlawful similar schemes to conduct surveys for listed species post-project approval. In *Northern Plains*, the Ninth Circuit found an agency's reliance on post-approval species surveys to further assess the impacts of a rail project violated NEPA. 668 F.3d at 1085. There, the agency did not conduct a survey of biological resources in the project area "due to the rough terrain." *Id.* Instead, as part of its mitigation measures, the agency planned to survey the area after approval to determine whether any listed plant species were present. *Id.* at 1084. The Court explained conducting such surveys after approval was unlawful

under NEPA because post-approval surveys would not help the agency understand the impact to inform its decisionmaking nor facilitate public participation. *Id*. at 1085 (holding the agency cannot use "mitigation measures as a proxy for baseline data.").

Just as the agency in *Northern Plains* could not rely on pre-construction surveys and mitigation measures to discharge its NEPA obligation to understand the effects of the action on listed plants, the Corps cannot rely on pre-construction surveys and mitigation measures to satisfy its duty to understand the project's impacts on listed coral. *See id.* at 1084 ("Mitigation measures may help alleviate impact after construction, but do not help to evaluate and understand the impact before construction."). Approving the dredging project first and searching for corals later "presupposes approval … without first understanding the extent of the problem." *Id*. at 1084–85. This does not serve NEPA's purpose of informing decisionmakers and the public the extent of coral damage dredging may cause.

In a similar vein, this Court has held an agency's approval of seafloor leases for offshore wind violated NEPA, owing to the environmental impact statement's "dearth of geophysical data." *Hopper*, 827 F.3d at 1082. The Court found, "[w]ithout adequate ... [geological hazard] surveys, [the agency] cannot 'ensure that the seafloor [will be] able to support' wind turbines." *Id*. at 1083. The requirement for post-approval geophysical surveys did not excuse this failure,

because "NEPA does not allow agencies to slice and dice proposals in this way." *Id*.; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast").

    C.    <u>The Corps unlawfully relied upon uncertain mitigation measures</u>.

The Corps also improperly relied on uncertain mitigation measures to find insignificant impacts to coral. The Corps states in the Assessment that to reduce impacts to coral, "the [Corps] will work in conjunction with the [Service] to develop a turbidity monitoring plan…. The monitoring plan will include adaptive management measures to be implemented to mitigate turbidity in the event that turbidity exceeds 7 [turbidity units] above background." JA217.

Because the turbidity monitoring plan has not been created, it cannot be evaluated as to its efficacy in detecting conditions that are harmful to corals. In addition, the adaptive management measures that would allegedly reduce turbidity are not disclosed, and thus similarly cannot be evaluated as to their effectiveness and potential to establish conditions beneficial to coral. The Corps' failure to incorporate proven and effective mitigation plans violates NEPA. For example, in *O'Reilly v. U.S. Army Corps of Engineers*, the Fifth Circuit considered whether the Corps reasonably issued an environmental assessment and finding of no significant

impact when it had failed to explain how mitigation measures would offset environmental damage. 477 F.3d 225 (5th Cir. 2007). The Fifth Circuit found "the [assessment] provides only cursory detail as to what those measures are and how they serve to reduce those impacts to a less-than-significant level," rendering the assessment unlawful. *Id.* at 234.

Similarly, the Ninth Circuit also found an environmental assessment that relied upon uncertain and unsupported mitigation measures to avoid a finding of significant impacts unlawful where that assessment failed to demonstrate how the mitigation measures would compensate for the adverse environmental impacts. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733–36 (9th Cir. 2001). The court emphasized the "'mere listing' of mitigation measures, without supporting analytical data," could not relieve the agency from preparing an environmental impact statement. *Id.* at 734. Just as the agency in *National Parks* unlawfully relied on uncertain and unsupported mitigation measures, the Corps here unlawfully relied on unsupported (and unknown) mitigation measures to conclude turbidity would be kept within the bounds of what listed corals can tolerate.

In short, the Corps failed to take the required hard look at impacts to threatened corals, rendering their Assessment and finding of no significant impact invalid.

**VI.    The Service violated the ESA in reaching its "not likely to adversely affect" determination for listed coral species.**

Despite the precarious state of corals in Puerto Rico, and the known impacts of dredging on imperiled corals, the Service concluded the dredging project is not likely to adversely affect the seven listed coral species. The Service's "not likely to adversely affect" Determination for the project does not satisfy the ESA's requirements and is therefore arbitrary, capricious, and otherwise not in accordance with law. The Determination is unlawful because it fails to support its conclusions and relies on unknown and uncertain mitigation measures to conclude the project will not harm threatened coral or their habitat.

A.    The ESA requires formal consultation if a proposed project may adversely impact listed species or critical habitat.

To "insure" their proposed actions will not "jeopardize the continued existence" of any listed species, or impair their critical habitats, federal agencies must consult with the expert wildlife agencies. 16 U.S.C. § 1536(a)(2). The consultation process must be based on "the best scientific and commercial data available." *Id.*; 50 C.F.R. § 402.12(d). First, the agency prepares a biological assessment to determine whether the proposed project is likely to adversely affect any listed or proposed species, or any designated or proposed critical habitat. 50 C.F.R. § 402.12. If the agency determines its proposed project is "not likely to

adversely affect" any listed species or critical habitat, and the Service concurs in writing, the agency may avoid formal consultation. 50 C.F.R. § 402.14(b).

A "not likely to adversely affect" determination is only available when the anticipated effects on a listed species are "discountable, insignificant, or completely beneficial." Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook 3-12 (1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf ("Consultation Handbook").[6] "Insignificant effects relate to the size of the impact and should never reach the scale where take occurs," while "[d]iscountable effects are those extremely unlikely to occur." *Id.*

In contrast, a finding that requires formal consultation, culminating in a full biological opinion on impacts, *see* 16 U.S.C. § 1536(b), is appropriate "if *any adverse effect* to listed species *may occur* as a direct or indirect result of the proposed action or its interrelated or interdependent actions." Consultation Handbook 3-13 (emphasis added). The threshold for triggering formal consultation under the ESA is low. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 178 (D.C. Cir. 2017) (If an action agency "determines that an action 'may affect' an endangered species, formal consultation is usually required"); *see also Growth*

---

[6] The Consultation Handbook is the Service's formal document, following public notice and comment procedures, for conducting consultation pursuant to section 7 of the ESA.

*Energy v. EPA*, 5 F.4th 1, 30 (D.C. Cir. 2021) ("'May affect' purposefully sets a low bar: 'Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement.'").

> B.    The Service's Determination is unsupported by the record and the best available science.

Here, the low threshold for triggering formal consultation regarding coral impacts was satisfied. The Service's contrary Determination for corals[7] acknowledged dredging can kill and harm listed corals by increasing sedimentation and turbidity. JA1186. The Service also recognized the maximum allowable turbidity in corals reefs during short-term construction events should be 7 Nephelometric Turbidity Units (a measure of turbidity, hereafter "turbidity units") or less. JA1186.

Yet the Service concluded its analysis by claiming that, despite the risks of turbidity and sedimentation, the project will avoid harm to corals by relying on a yet-to-be-developed monitoring plan that contains yet-to-be-developed "adaptive management measures." JA1186–87. This conclusion is unsupported by the record and fails to grapple with the large body of science[8] that demonstrates the harmful

---

[7] The Service's Determination for corals is contained within a biological opinion that concluded the project may adversely affect sea turtles through injuries and death from hopper dredge interactions. JA1170–88.

[8] *See*, *e.g.* JA1213 ("[d]redging is particularly stressful for corals as it increases turbidity and sedimentation"); JA1236 (finding impacts to corals extending 700 meters from dredging).

impacts of dredging on nearby coral populations. *See Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (holding an "agency 'cannot ignore available biological information or fail to develop projections' which may indicate potential conflicts between the proposed action and the preservation of endangered species"); *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1156–57 (D.C. Cir. 2011) (finding a not likely to adversely affect determination arbitrary and capricious because it did not evaluate all relevant scientific information).

In 2017, prior to publishing the Determination, the Service sent a letter to the Corps voicing its significant concerns with the Corps' Biological Assessment finding no harm to listed coral. JA1189–96. *See also* JA855–970 (Corps' Biological Assessment). That letter states, "[The Service] is unable to concur with the determination that the project is not likely to adversely affect ESA-listed corals and coral critical habitat," without further information on various topics including a quantitative analysis regarding turbidity and sedimentation, finalized monitoring plans, and survey data that identifies the number and location of ESA-listed corals in and around the project area. JA1189–96.

Despite the concern it voiced in its 2017 letter, the Service proceeded to make its contrary 2018 Determination without providing any explanation why the concerns it previously believed warranted an in-depth evaluation no longer merited

review. At a scant 2 1/2 pages, the Determination does not engage with the scientific concerns the agency itself raised merely months before. JA1185–88. Nothing in the record supports, or even begins to explain, the Service's flip-flop in position. The agency's failure to evaluate the scientific concerns it had raised the previous year is unlawful and violates the APA and the ESA. *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 537 (2009) (finding an agency's unexplained change in position was arbitrary and capricious).

For example, in response to the Corps' Biological Assessment, the Service asked for a quantitative analysis to understand "the potential turbidity and sediment impacts from scow leakage over the life of the project to ESA-listed species and [critical habitat]." JA1189. The 2017 letter plainly stated the agency's concern with the Corps' lack of analysis on potential sedimentation impacts from transport of dredged material. JA1190 ("[The Service] is concerned about sedimentation impacts to ESA-listed corals and [critical habitat] from dredging and from leaking disposal vessels traversing [the harbor mouth] area on the way to the offshore disposal areas.").

The Service in 2017 also emphasized errors in the Biological Assessment that suggested the Port of Miami project resulted in only insignificant impacts, when in fact it killed hundreds of thousands of corals. JA1193. The agency then requested the Corps conduct an analysis to "quantify the potential turbidity and

43

sediment impacts from scow leakage over the life of the project to ESA-listed species and critical habitat." JA1190. No such analysis exists, and yet the Service concurred with the "not likely to adversely affect" conclusion merely months later. This Determination, in addition to contradicting and ignoring the Service's earlier concerns, is also contradicted by a large body of science after the Miami project demonstrating that dredging's impacts to corals extended well beyond the perimeter examined by the Service. JA1236.[9]

The Service's unexplained reversal is insufficient to enable a conclusion that their decision "was the product of reasoned decisionmaking." *See State Farm*, 463 U.S. at 52. The Service failed to engage with the science its own staff believed indicated harm to corals and triggered formal consultation. *See* JA1189 ("[The Service"] feels the [Corps] did not use the best available scientific and commercial data standard."). There is nothing in the record that answers the fundamental questions and concerns of the Service's 2017 letter or demonstrates the agency

---

[9] A 2022 "Memorandum-to-File," JA1167–68, offering a post-hoc rationalization of the differences between San Juan Harbor and the Port of Miami cannot be used to cure the flaws in the 2018 Determination. The decision before this court—the Service's Determination—occurred in 2018, and any justification or evidence to support this Determination must predate that decision. Bedrock administrative law provides that a reviewing court may only consider the justifications for an agency rule advanced by the agency at the time of decision; it may not consider post-hoc justifications. *See Camp v. Pitta*, 411 U.S. 138, 142 (1973); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (a court's review "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision.").

evaluated the impacts of dredging to corals and "articulated a rational connection" to their conclusion that these impacts would be insignificant. *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 15 (D.D.C. 2014) (agency must articulate "rational connection between facts found and the choices made" in ESA consultation).

In essence, the Service in its Determination asks the Court to "trust them that they looked at relevant data" and that their conclusions are reasonable in light of the data it considered. *Ctr. for Biological Diversity v. Forest Serv.*, 444 F.Supp.3d 832, 870 (S.D. Ohio 2020). This is insufficient: "if the agency does not show its work, the Court cannot evaluate whether its decision was reasonable." *Id. See also State Farm*, 463 U.S. at 50, 56 ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). Here, it is "impossible to determine whether" the relevant coral science and impacts of the dredging's sedimentation and turbidity "[were] rationally discounted because of [their] inconclusive nature, or arbitrarily ignored," rendering the consultation unlawful. *See Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 369 (E.D. Cal. 2007).

C.    <u>The Service cannot rely on uncertain mitigation measures to find project is not likely to adversely affect threatened corals.</u>

To reach its conclusion that the project is not likely adversely affected listed corals, the Service relied on mitigation measures that do not yet exist. This violates the ESA.

The Service may rely on mitigation measures to support its conclusions in an ESA consultation "only where they involve 'specific and binding plans' and 'a clear, definite commitment of resources for future improvements' to implement those measures." *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1001 (D. Ariz. 2011) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008)). Furthermore, "[t]he measures 'must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.'" *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (citation omitted). "By definition … unidentified mitigation measures are not 'reasonably specific, certain to occur, and capable of implementation.'" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1126 (D. Or. 2011) (citation omitted). A "sincere general commitment to future improvements" is not enough to offset the negative effects of an action "absent specific and binding plans." *Nat'l Wildlife Fed'n*, 524 F.3d at 936.

46

The Service's reliance on uncertain and unproven mitigation measures in its Determination violates the ESA. Throughout the Determination, the Service repeatedly asserted mitigation measures would be imposed and these measures would offset the impacts of the dredging project. The Service's failure to identify what specific mitigation measures would be implemented and how those measures would mitigate the specific impacts of the dredging project to listed corals render the agency's Determination arbitrary and unlawful.

To support its Determination, the Service repeatedly referred to a turbidity monitoring plan the agency will develop in partnership with the Corps. JA1186. The contents of this monitoring plan are sparse at best; turbidity monitoring stations will be placed adjacent to ESA-listed corals and once turbidity reaches seven units above background, amorphous "adaptive management measures" will be implemented to mitigate turbidity. JA1187. With these unknown mitigation measures, the Service "believes that effects to ESA listed corals to be discountable." *Id.*

Like the mitigation measures the Ninth Circuit struck down in *Center for Biological Diversity v. Bernhart*, "[t]he administrative record does reflect a 'general desire' to impose mitigation strategies, but it does not reflect a definite commitment to those improvements." 982 F.3d at 747. The monitoring plan does not cite any studies on the effectiveness of turbidity monitoring or in any way

47

explain how such monitoring alone will effectively mitigate the project's myriad

impacts from sedimentation and turbidity. For example, it does not specify the

number of the monitoring stations, their effectiveness and reliability in detecting

turbidity, or how the agencies will be alerted if exceedances are detected. And once

turbidity reaches the trigger for "adaptive management measures," it does not

explain what those measures are and how they would be implemented. By failing

to describe specific, enforceable mitigation measures and assess their effectiveness,

the Service has failed to "address the threats to the species" needed to properly

satisfy the "not likely to adversely affect" standard. *See Ctr. for Biological*

*Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002).

     Moreover, the vague mitigation measures only purport to apply once

turbidity reaches seven turbidity units above background levels. JA1187. But at

this turbidity level, as the Service acknowledges, corals will be adversely affected

by sedimentation in the form of smothering, reduced feeding, and depleted energy

reserves. JA1186 (finding the maximum allowable turbidity in corals reefs during

short-term construction events should be seven turbidity units or less). Hence, it is

when damage to corals is certain to occur that uncertain mitigation will come into

play. That affords no reasonable basis on which the Service could make a "not

likely to adversely affect" Determination. *See Rumsfeld*, 198 F. Supp. 2d at 1154

(finding that without specific and effective mitigation measures, "there is no factual basis and no rational basis" for an agency's ESA determination).

In short, the Service's reliance on uncertain and unproven mitigation measures to support its finding that the project will not adversely impact listed corals was arbitrary and capricious and not in accordance with the ESA.

## VII.  The Corps' and Service's decisions should be vacated.

"The ordinary practice ... is to vacate unlawful agency action." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citation omitted); *see also* 5 U.S.C. § 706(2)(A). In weighing whether to depart from vacatur, this Court considers the "seriousness" of the agency's deficiencies, and the "disruptive consequences" of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

This Court should vacate the Corps' Environmental Assessment and Finding of No Significant Impact. The NEPA violations concern fundamental principles of considering the overall impacts of connected and cumulative actions prior to determining whether to proceed with a proposed action. At issue are also adverse impacts to already-burdened local communities, as well as corals that are threatened with extinction. These defects require additional analysis, public involvement, and consideration by the Corps. *See Standing Rock*, 985 F.3d at 1052 ("[B]ecause NEPA is a 'purely procedural statute,' where an agency's NEPA

49

review suffers from 'a significant deficiency,' refusing to vacate the corresponding

agency action would 'vitiate' the statute." (citation omitted)). In addition, the

Service's ESA violation is a "serious deficiency" thwarting the ESA's intent to

insure the protection of threatened species. *Jewell*, 62 F. Supp. 3d at 20–21 (the

failure to properly consult under ESA Section 7 is a serious deficiency and not

merely a procedural defect).

The importance of reconsidering this project in an informed and unbiased

manner heavily outweighs any disruptive consequences of vacatur. *See Standing

Rock*, 985 F.3d at 1051, 1054 (upholding vacatur despite its significant economic

consequences because allowing the decision to stand would subvert NEPA's

objectives).

## CONCLUSION

For the foregoing reasons, the Court should vacate and remand for further

consideration the Corps' Environmental Assessment and Finding of No Significant

Impact, and the Service's not-likely-to-adversely-affect decision.


Dated: November 20, 2023          Respectfully submitted,


                                  /s/ *Catherine Kilduff*
                                  Catherine Kilduff (D.C. Cir. Bar. No. 64754)
                                  Emily Jeffers (D.C. Cir. Bar. No. 64779)
                                  Center for Biological Diversity
                                  1212 Broadway, Suite 800

Oakland, CA 94612
(510) 844-7100
ckilduff@biologicaldiversity.org
ejeffers@biologicaldiversity.org

Marc Fink (D.C. Cir. Bar No. 64776)
Center for Biological Diversity
209 East 7th St
Duluth, MN 55805
(218) 464-0539
mfink@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify this brief complies with the type-volume limitation of Rule 32(a)(7) of the Federal Rules of Appellate Procedure and the Order of this Court dated September 12, 2023 (Doc No. 2016401). As measured by the word-processing system used to prepare this Final Opening Brief, the brief contains 10,961 words. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point, proportionally spaced, Roman-style typeface (Times New Roman).

Dated: November 20, 2023

/s/ *Catherine Kilduff*
Catherine Kilduff

## CERTIFICATE OF SERVICE

I certify that on November 20, 2023, I served the foregoing Final Opening Brief of Petitioners-Appellants on all registered counsel through the Court's electronic filing system (ECF).

Dated: November 20, 2023

/s/ *Catherine Kilduff*
Catherine Kilduff

# Plaintiffs-Appellants'
# Statutory and Regulatory Addendum

# STATUTORY AND REGULATORY ADDENDUM

## Statutes

5 U.S.C. § 706(2)(A)..................................................................................A1

16 U.S.C. § 1536(a)–(b)............................................................................A2

16 U.S.C. § 1540(g)..................................................................................A6

28 U.S.C. § 1291.......................................................................................A8

28 U.S.C. § 1331.......................................................................................A9

42 U.S.C. § 4332(2)(C)............................................................................A10

## Regulations

40 C.F.R. § 1500.1(b) (2018)....................................................................A11

40 C.F.R. § 1501.4 (2018).........................................................................A12

40 C.F.R. § 1508.7 (2018).........................................................................A13

40 C.F.R. § 1508.8 (2018).........................................................................A14

40 C.F.R. § 1508.25(a) (2018)...................................................................A15

50 C.F.R. § 402.12 ....................................................................................A16

50 C.F.R. § 402.14(b)................................................................................A20

## Other Authorities

Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 16, 1994)................................A21

## 5 U.S.C. § 706(2)(A)

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 16 U.S.C. § 1536(a)–(b)

## § 1536. Interagency cooperation

### (a) Federal agency actions and consultations.

**(1)**  The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act [16 U.S.C. § 1533].

**(2)**  Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

**(3)**  Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

**(4)**  Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 4 [16 U.S.C. § 1533] or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

A2

**(b) Opinion of Secretary.**

**(1)**

**(A)** Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

**(B)** In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)—

**(i)** if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth—

**(I)** the reasons why a longer period is required,

**(II)** the information that is required to complete the consultation, and

**(III)** the estimated date on which consultation will be completed; or

**(ii)** if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

**(2)** Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

**(3)**

**(A)** Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the

A3

opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

**(B)**  Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

**(4)**  If after consultation under subsection (a)(2), the Secretary concludes that—

**(A)**  the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

**(B)**  the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

**(C)**  if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972 [16 USCS §§ 1361 et seq.]

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

**(i)**  specifies the impact of such incidental taking on the species,

**(ii)**  specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

**(iii)**  in the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 [16 USCS §§ 1361 et seq.] with regard to such taking, and

A4

**(iv)** sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

### 16 U.S.C. § 1540(g)

### § 1540. Penalties and enforcement

**(g) Citizen suits.**

**(1)** Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

**(A)** to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof; or

**(B)** to compel the Secretary to apply, pursuant to section 6(g)(2)(B)(ii) of this Act [16 U.S.C. § 1535(g)(2)(B)(ii)], the prohibitions set forth in or authorized pursuant to section 4(d) or section 9(a)(1)(B) of this Act [16 USCS §§ 1533(d), 1538(a)(1)(B)] with respect to the taking of any resident endangered species or threatened species within any State; or

**(C)** against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 4 [16 U.S.C. § 1533] which is not discretionary with the Secretary.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence.

**(2)**

**(A)** No action may be commenced under subparagraph (1)(A) of this section—

**(i)** prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

**(ii)** if the Secretary has commenced action to impose a penalty

pursuant to subsection (a) of this section; or

**(iii)** if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

**(B)** No action may be commenced under subparagraph (1)(B) of this section—

**(i)** prior to sixty days after written notice has been given to the Secretary setting forth the reasons why an emergency is thought to exist with respect to an endangered species or a threatened species in the State concerned; or

**(ii)** if the Secretary has commenced and is diligently prosecuting action under section 6(g)(2)(B)(ii) of this Act [16 U.S.C. § 1535(g)(2)(B)(ii)] to determine whether any such emergency exists.

**(C)** No action may be commenced under subparagraph (1)(C) of this section prior to sixty days after written notice has been given to the Secretary; except that such action may be brought immediately after such notification in the case of an action under this section respecting an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants.

**(3)**

**(A)** Any suit under this subsection may be brought in the judicial district in which the violation occurs.

**(B)** In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

**(4)** The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

**(5)** The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Secretary or a State agency).

A7

## 28 U.S.C. § 1291

### § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title [28 U.S.C. §§ 1292(c) and (d) and 1295].

**28 U.S.C. § 1331**

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 42 U.S.C. § 4332(2)(C)

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act [42 USCS §§ 4321 et seq.], and (2) all agencies of the Federal Government shall—

(C) consistent with the provisions of this Act [42 U.S.C. §§ 4321 et seq.] and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) reasonably foreseeable environmental effects of the proposed agency action;

(ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

**40 C.F.R. § 1500.1(b) (2018)**

**§ 1500.1 Purpose and policy.**

**(b)** NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

## 40 C.F.R. § 1501.4 (2018)

### § 1501.4 Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

**(a)** Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

**(1)** Normally requires an environmental impact statement, or

**(2)** Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

**(b)** If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

**(c)** Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

**(d)** Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

**(e)** Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

**(1)** The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

**(2)** In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

**(i)** The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

**(ii)** The nature of the proposed action is one without precedent.

A12

**40 C.F.R. § 1508.7 (2018)**

**§ 1508.7 Cumulative impact.**

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**40 C.F.R. § 1508.8 (2018)**

**§ 1508.8 Effects.**

"Effects" include:

**(a)** Direct effects, which are caused by the action and occur at the same time and place.

**(b)** Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

A14

## 40 C.F.R. § 1508.25(a) (2018)

### § 1508.25 Scope.

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

A15

## 50 C.F.R. § 402.12

### § 402.12 Biological assessments.

**(a)** Purpose. A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary.

**(b) Preparation requirement.**

> **(1)** The procedures of this section are required for Federal actions that are "major construction activities"; provided that a contract for construction was not entered into or actual construction was not begun on or before November 10, 1978. Any person, including those who may wish to apply for an exemption from section 7(a)(2) of the Act, may prepare a biological assessment under the supervision of the Federal agency and in cooperation with the Service consistent with the procedures and requirements of this section. An exemption from the requirements of section 7(a)(2) is not permanent unless a biological assessment has been prepared.

> **(2)** The biological assessment shall be completed before any contract for construction is entered into and before construction is begun.

**(c)** Request for information. The Federal agency or the designated non-Federal representative shall convey to the Director either (1) a written request for a list of any listed or proposed species or designated or proposed critical habitat that may be present in the action area; or (2) a written notification of the species and critical habitat that are being included in the biological assessment.

**(d)** Director's response. Within 30 days of receipt of the notification of, or the request for, a species list, the Director shall either concur with or revise the list or, in those cases where no list has been provided, advise the Federal agency or the designated non-Federal representative in writing whether, based on the best scientific and commercial data available, any listed or proposed species or designated or proposed critical habitat may be present in the action area. In addition to listed and proposed species, the Director will provide a list of candidate species that may be present in the action area. Candidate species refers to any species being considered by the Service for listing as endangered or threatened species but not yet the subject of a proposed rule. Although

candidate species have no legal status and are accorded no protection under the Act, their inclusion will alert the Federal agency of potential proposals or listings.

> **(1)** If the Director advises that no listed species or critical habitat may be present, the Federal agency need not prepare a biological assessment and further consultation is not required. If only proposed species or proposed critical habitat may be present in the action area, then the Federal agency must confer with the Service if required under § 402.10, but preparation of a biological assessment is not required unless the proposed listing and/or designation becomes final.

> **(2)** If a listed species or critical habitat may be present in the action area, the Director will provide a species list or concur with the species list provided. The Director also will provide available information (or references thereto) regarding these species and critical habitat, and may recommend discretionary studies or surveys that may provide a better information base for the preparation of an assessment. Any recommendation for studies or surveys is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act.

**(e)** Verification of current accuracy of species list. If the Federal agency or the designated non-Federal representative does not begin preparation of the biological assessment within 90 days of receipt of (or concurrence with) the species list, the Federal agency or the designated non-Federal representative must verify (formally or informally) with the Service the current accuracy of the species list at the time the preparation of the assessment is begun.

**(f)** Contents. The contents of a biological assessment are at the discretion of the Federal agency and will depend on the nature of the Federal action. The following may be considered for inclusion:

> **(1)** The results of an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally.

> **(2)** The views of recognized experts on the species at issue.

> **(3)** A review of the literature and other information.

> **(4)** An analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies.

A17

**(5)** An analysis of alternate actions considered by the Federal agency for the proposed action.

**(g)** Incorporation by reference. If a proposed action requiring the preparation of a biological assessment is identical, or very similar, to a previous action for which a biological assessment was prepared, the Federal agency may fulfill the biological assessment requirement for the proposed action by incorporating by reference the earlier biological assessment, plus any supporting data from other documents that are pertinent to the consultation, into a written certification that:

**(1)** The proposed action involves similar impacts to the same species in the same geographic area;

**(2)** No new species have been listed or proposed or no new critical habitat designated or proposed for the action area; and

**(3)** The biological assessment has been supplemented with any relevant changes in information.

**(h)** Permit requirements. If conducting a biological assessment will involve the taking of a listed species, a permit under section 10 of the Act (16 U.S.C. 1539) and part 17 of this title (with respect to species under the jurisdiction of the FWS) or parts 220, 222, and 227 of this title (with respect to species under the jurisdiction of the NMFS) is required.

**(i)** Completion time. The Federal agency or the designated non- Federal representative shall complete the biological assessment within 180 days after its initiation (receipt of or concurrence with the species list) unless a different period of time is agreed to by the Director and the Federal agency. If a permit or license applicant is involved, the 180-day period may not be extended unless the agency provides the applicant, before the close of the 180-day period, with a written statement setting forth the estimated length of the proposed extension and the reasons why such an extension is necessary.

**(j)** Submission of biological assessment. The Federal agency shall submit the completed biological assessment to the Director for review. The Director will respond in writing within 30 days as to whether or not he concurs with the findings of the biological assessment. At the option of the Federal agency, formal consultation may be initiated under § 402.14(c) concurrently with the submission of the assessment.

**(k)  Use of the biological assessment.**

**(1)** The Federal agency shall use the biological assessment in determining whether formal consultation or a conference is required under § 402.14 or

§ 402.10, respectively. If the biological assessment indicates that there are no listed species or critical habitat present that are likely to be adversely affected by the action and the Director concurs as specified in paragraph (j) of this section, then formal consultation is not required. If the biological assessment indicates that the action is not likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat, and the Director concurs, then a conference is not required.

**(2)** The Director may use the results of the biological assessment in (i) determining whether to request the Federal agency to initiate formal consultation or a conference, (ii) formulating a biological opinion, or (iii) formulating a preliminary biological opinion.

## 50 C.F.R. § 402.14(b)

**§ 402.14 Formal consultation.**

**(b)** Exceptions.

**(1)** A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

**(2)** A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

Federal Register

Vol. 59, No. 32

Wednesday, February 16, 1994

# Presidential Documents

Title 3—

**The President**

Executive Order 12898 of February 11, 1994

## Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1–1.** *Implementation.*

**1–101.** *Agency Responsibilities.* To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Mariana Islands.

**1–102.** *Creation of an Interagency Working Group on Environmental Justice.* (a) Within 3 months of the date of this order, the Administrator of the Environmental Protection Agency ("Administrator") or the Administrator's designee shall convene an interagency Federal Working Group on Environmental Justice ("Working Group"). The Working Group shall comprise the heads of the following executive agencies and offices, or their designees: (a) Department of Defense; (b) Department of Health and Human Services; (c) Department of Housing and Urban Development; (d) Department of Labor; (e) Department of Agriculture; (f) Department of Transportation; (g) Department of Justice; (h) Department of the Interior; (i) Department of Commerce; (j) Department of Energy; (k) Environmental Protection Agency; (l) Office of Management and Budget; (m) Office of Science and Technology Policy; (n) Office of the Deputy Assistant to the President for Environmental Policy; (o) Office of the Assistant to the President for Domestic Policy; (p) National Economic Council; (q) Council of Economic Advisers; and (r) such other Government officials as the President may designate. The Working Group shall report to the President through the Deputy Assistant to the President for Environmental Policy and the Assistant to the President for Domestic Policy.

(b) The Working Group shall: (1) provide guidance to Federal agencies on criteria for identifying disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(2) coordinate with, provide guidance to, and serve as a clearinghouse for, each Federal agency as it develops an environmental justice strategy as required by section 1–103 of this order, in order to ensure that the administration, interpretation and enforcement of programs, activities and policies are undertaken in a consistent manner;

(3) assist in coordinating research by, and stimulating cooperation among, the Environmental Protection Agency, the Department of Health and Human Services, the Department of Housing and Urban Development, and other agencies conducting research or other activities in accordance with section 3–3 of this order;

(4) assist in coordinating data collection, required by this order;

(5) examine existing data and studies on environmental justice;

(6) hold public meetings as required in section 5–502(d) of this order; and

(7) develop interagency model projects on environmental justice that evidence cooperation among Federal agencies.

**1–103.** *Development of Agency Strategies.* (a) Except as provided in section 6–605 of this order, each Federal agency shall develop an agency-wide environmental justice strategy, as set forth in subsections (b)–(e) of this section that identifies and addresses disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. The environmental justice strategy shall list programs, policies, planning and public participation processes, enforcement, and/or rulemakings related to human health or the environment that should be revised to, at a minimum: (1) promote enforcement of all health and environmental statutes in areas with minority populations and low-income populations; (2) ensure greater public participation; (3) improve research and data collection relating to the health of and environment of minority populations and low-income populations; and (4) identify differential patterns of consumption of natural resources among minority populations and low-income populations. In addition, the environmental justice strategy shall include, where appropriate, a timetable for undertaking identified revisions and consideration of economic and social implications of the revisions.

(b) Within 4 months of the date of this order, each Federal agency shall identify an internal administrative process for developing its environmental justice strategy, and shall inform the Working Group of the process.

(c) Within 6 months of the date of this order, each Federal agency shall provide the Working Group with an outline of its proposed environmental justice strategy.

(d) Within 10 months of the date of this order, each Federal agency shall provide the Working Group with its proposed environmental justice strategy.

(e) Within 12 months of the date of this order, each Federal agency shall finalize its environmental justice strategy and provide a copy and written description of its strategy to the Working Group. During the 12 month period from the date of this order, each Federal agency, as part of its environmental justice strategy, shall identify several specific projects that can be promptly undertaken to address particular concerns identified during the development of the proposed environmental justice strategy, and a schedule for implementing those projects.

(f) Within 24 months of the date of this order, each Federal agency shall report to the Working Group on its progress in implementing its agency-wide environmental justice strategy.

(g) Federal agencies shall provide additional periodic reports to the Working Group as requested by the Working Group.

**1–104.** *Reports to the President.* Within 14 months of the date of this order, the Working Group shall submit to the President, through the Office of the Deputy Assistant to the President for Environmental Policy and the Office of the Assistant to the President for Domestic Policy, a report that describes the implementation of this order, and includes the final environmental justice strategies described in section 1–103(e) of this order.

**Sec. 2–2.** *Federal Agency Responsibilities for Federal Programs.* Each Federal agency shall conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin.

Sec. 3–3. *Research, Data Collection, and Analysis.*

**3–301.** *Human Health and Environmental Research and Analysis.* (a) Environmental human health research, whenever practicable and appropriate, shall include diverse segments of the population in epidemiological and clinical studies, including segments at high risk from environmental hazards, such as minority populations, low-income populations and workers who may be exposed to substantial environmental hazards.

(b) Environmental human health analyses, whenever practicable and appropriate, shall identify multiple and cumulative exposures.

(c) Federal agencies shall provide minority populations and low-income populations the opportunity to comment on the development and design of research strategies undertaken pursuant to this order.

**3–302.** *Human Health and Environmental Data Collection and Analysis.* To the extent permitted by existing law, including the Privacy Act, as amended (5 U.S.C. section 552a): (a) each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information assessing and comparing environmental and human health risks borne by populations identified by race, national origin, or income. To the extent practical and appropriate, Federal agencies shall use this information to determine whether their programs, policies, and activities have disproportionately high and adverse human health or environmental effects on minority populations and low-income populations;

(b) In connection with the development and implementation of agency strategies in section 1–103 of this order, each Federal agency, whenever practicable and appropriate, shall collect, maintain and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding facilities or sites expected to have a substantial environmental, human health, or economic effect on the surrounding populations, when such facilities or sites become the subject of a substantial Federal environmental administrative or judicial action. Such information shall be made available to the public, unless prohibited by law; and

(c) Each Federal agency, whenever practicable and appropriate, shall collect, maintain, and analyze information on the race, national origin, income level, and other readily accessible and appropriate information for areas surrounding Federal facilities that are: (1) subject to the reporting requirements under the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. section 11001–11050 as mandated in Executive Order No. 12856; and (2) expected to have a substantial environmental, human health, or economic effect on surrounding populations. Such information shall be made available to the public, unless prohibited by law.

(d) In carrying out the responsibilities in this section, each Federal agency, whenever practicable and appropriate, shall share information and eliminate unnecessary duplication of efforts through the use of existing data systems and cooperative agreements among Federal agencies and with State, local, and tribal governments.

Sec. 4–4. *Subsistence Consumption of Fish and Wildlife.*

**4–401.** *Consumption Patterns.* In order to assist in identifying the need for ensuring protection of populations with differential patterns of subsistence consumption of fish and wildlife, Federal agencies, whenever practicable and appropriate, shall collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence. Federal agencies shall communicate to the public the risks of those consumption patterns.

**4–402.** *Guidance.* Federal agencies, whenever practicable and appropriate, shall work in a coordinated manner to publish guidance reflecting the latest scientific information available concerning methods for evaluating the human health risks associated with the consumption of pollutant-bearing fish or

wildlife. Agencies shall consider such guidance in developing their policies and rules.

**Sec. 5–5.** *Public Participation and Access to Information.* (a) The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies. Each Federal agency shall convey such recommendations to the Working Group.

(b) Each Federal agency may, whenever practicable and appropriate, translate crucial public documents, notices, and hearings relating to human health or the environment for limited English speaking populations.

(c) Each Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public.

(d) The Working Group shall hold public meetings, as appropriate, for the purpose of fact-finding, receiving public comments, and conducting inquiries concerning environmental justice. The Working Group shall prepare for public review a summary of the comments and recommendations discussed at the public meetings.

**Sec. 6–6.** *General Provisions.*

**6–601.** *Responsibility for Agency Implementation.* The head of each Federal agency shall be responsible for ensuring compliance with this order. Each Federal agency shall conduct internal reviews and take such other steps as may be necessary to monitor compliance with this order.

**6–602.** *Executive Order No. 12250.* This Executive order is intended to supplement but not supersede Executive Order No. 12250, which requires consistent and effective implementation of various laws prohibiting discriminatory practices in programs receiving Federal financial assistance. Nothing herein shall limit the effect or mandate of Executive Order No. 12250.

**6–603.** *Executive Order No. 12875.* This Executive order is not intended to limit the effect or mandate of Executive Order No. 12875.

**6–604.** *Scope.* For purposes of this order, Federal agency means any agency on the Working Group, and such other agencies as may be designated by the President, that conducts any Federal program or activity that substantially affects human health or the environment. Independent agencies are requested to comply with the provisions of this order.

**6–605.** *Petitions for Exemptions.* The head of a Federal agency may petition the President for an exemption from the requirements of this order on the grounds that all or some of the petitioning agency's programs or activities should not be subject to the requirements of this order.

**6–606.** *Native American Programs.* Each Federal agency responsibility set forth under this order shall apply equally to Native American programs. In addition, the Department of the Interior, in coordination with the Working Group, and, after consultation with tribal leaders, shall coordinate steps to be taken pursuant to this order that address Federally-recognized Indian Tribes.

**6–607.** *Costs.* Unless otherwise provided by law, Federal agencies shall assume the financial costs of complying with this order.

**6–608.** *General.* Federal agencies shall implement this order consistent with, and to the extent permitted by, existing law.

**6–609.** *Judicial Review.* This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance

of the United States, its agencies, its officers, or any other person with this order.

THE WHITE HOUSE,
*February 11, 1994.*

[FR Citation 59 FR 7629]