**ORAL ARGUMENT SCHEDULED ON JANUARY 25, 2024**

No. 23-5189

————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

EL PUENTE DE WILLIAMSBURG, CORALATIONS,
CENTER FOR BIOLOGICAL DIVERSITY,

Plaintiffs-Appellants,

v.

U.S. ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON,
NATIONAL MARINE FISHERIES SERVICE, GINA RAIMONDO,
U.S. FISH AND WILDLIFE SERVICE, DEBRA HAALAND,

Defendants-Appellees.

————————————

Appeal from the United States District Court
For the District of Columbia
No. 1:22-cv-02430-CJN

———————————————————————————————————————

**PLAINTIFFS-APPELLANTS' FINAL REPLY BRIEF**

———————————————————————————————————————

Catherine Kilduff & Emily Jeffers
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7100
ckilduff@biologicaldiversity.org
ejeffers@biologicaldiversity.org

Marc Fink
Center for Biological Diversity
209 East 7th St
Duluth, MN 55805
(218) 464-0539
mfink@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY .......................................................................................... vi

INTRODUCTION .................................................................................... 1

ARGUMENT ........................................................................................... 2

    I.    The Corps failed to consider reasonably foreseeable LNG
        development as a "connected action," "cumulative impact,"
        and/or "indirect effect." ........................................................... 2

        A.    The Corps was sufficiently on notice that the dredging
                project and planned LNG development in the Harbor
                were connected actions ............................................... 3

        B.    The Corps was required to consider the dredging project
                and LNG development as connected actions when it
                prepared the Assessment ............................................. 5

        C.    The Corps failed to consider the cumulative impacts
                of all past, present, and reasonably foreseeable future
                actions in the Assessment ........................................... 7

        D.    The Corps failed to consider the indirect effects of
                LNG development .................................................... 11

    II.   The Corps cannot cure its faulty environmental justice analysis
        with a post-hoc analysis. ......................................................... 12

    III.  Defendants failed to adequately consider impacts to threatened coral. ........ 15

        A.    The Corps' Environmental Assessment violates NEPA ............ 15

                1.    The Corps unlawfully made its finding without any
                     data on corals at the mouth of San Juan Harbor .............. 16

2.    The Corps failed to take a hard look at the Miami dredging project ................................................... 17

B.    The Service's ESA determination is unlawful ......................... 19

1.    The Service failed to provide a rational explanation for its "not likely to adversely affect" determination ........ 19

2.    The Service's monitoring and mitigation plan is inadequate as a matter of law ........................................... 21

CONCLUSION .......................................................................................... 24

CERTIFICATE OF COMPLIANCE ...................................................... 25

CERTIFICATE OF SERVICE ............................................................... 25

# TABLE OF AUTHORITIES*

## Cases

*Better Gov't Ass'n v. Dep't of State*,
    780 F.2d 86 (D.C. Cir. 1986) ...............................................................13

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)........................................................................ 5, 18

*CTIA-The Wireless Ass'n v. FCC*,
    466 F.3d 105 (D.C. Cir. 2006) ...............................................................5

*Ctr. for Biological Diversity v. Bernhart*,
    982 F.3d 723 (9th Cir. 2020) ...............................................................23

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ..............................................................23

*Ctr. for Sustainable Econ. v. Jewell*,
    779 F.3d 588 (D.C. Cir. 2015)................................................................5

* *Del. Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) .............................................................8

*Dept. of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004)..............................................................................4

* *Eagle Cnty. v. Surface Transp. Bd.*,
    82 F.4th 1152 (D.C. Cir. 2023) ........................................................9, 11

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021) ...................................................................19

*Humane Soc'y of the U.S. v. Dept. of Com.*,
    432 F. Supp. 2d 4 (D.D.C. 2006) ...........................................................9

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) .................................................................7

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) ....................................................... 12, 13

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ..............................................17

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ................................................17

*Nat'l Parks Conservation Ass'n v. Jewell*,
    62 F. Supp. 3d 7 (D.D.C. 2014) ...........................................20

*Nat'l Wildlife Fed'n v. FERC*,
    912 F.2d 1471 (D.C. Cir. 1990) ..........................................6, 7

* *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ................................................22

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ..............................................13

* *Pub. Emps. for Env't Responsibility v. Hopper*,
    827 F.3d 1077 (D.C. Cir. 2016) ...........................................16

*Save the Yaak Comm. v. Block*,
    840 F.2d 714 (9th Cir. 1988) ..................................................9

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016) ..................................................5

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015) ..................................................6

*Sierra Club v. Watkins*,
    808 F. Supp. 852 (D.D.C. 1991) .........................................14

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*,
    608 F.3d 592 (9th Cir. 2010) ..................................................9

iv

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ........................................................ 9, 23

\* *Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ...................................................12

**Statutes**

16 U.S.C. § 1536(a)(2)................................................................2

**Regulations**

40 C.F.R. § 1500.1(b)................................................................2

40 C.F.R. § 1508.25 ..................................................................7

\* 40 C.F.R. § 1508.25(a)(1) ......................................................2

\* 40 C.F.R. § 1508.7 ............................................................ 3, 10

\* 40 C.F.R. § 1508.8(b)........................................................3, 11

\* Authorities upon which Appellants chiefly rely are marked with asterisks pursuant to D.C. Circuit Rule 28(a)(2).

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Authority | Puerto Rico Electric Power Authority |
| Corps | U.S. Army Corps of Engineers |
| Def. Br. | Brief for Appellees (ECF No. 2024231) |
| Determination | National Marine Fisheries Service's 2018 Not Likely to Adversely Affect Determination for Threatened Corals |
| El Puente | Plaintiffs-Appellants El Puente de Williamsburg, CORALations, and Center for Biological Diversity |
| El Puente Br. | Brief for Appellants (ECF No. 2018545) |
| Environmental Assessment or Assessment | U.S. Army Corps of Engineers' August 2018 Integrated Feasibility Report and Environmental Assessment for the San Juan Harbor Dredging Project |
| ESA | Endangered Species Act |
| LNG | Liquefied Natural Gas |
| NEPA | National Environmental Policy Act |
| Service | National Marine Fisheries Service |

## INTRODUCTION

The Corps' 2018 Environmental Assessment took, at best, a cursory look at issues fundamental to Puerto Rico's future: the need for renewable energy, environmental justice, and healthy coral ecosystems. The dredging project's purpose is to accommodate larger petroleum and liquified natural gas ("LNG") tankers, without which the Puerto Rico Electric Power Authority ("Authority") could not economically justify conversion to LNG. JA331 (smaller vessels "would make the project not feasible"). Yet the Corps did not consider the environmental impacts of the planned LNG conversion. Nor did it accurately assess the impacts to environmental justice communities next to the dredging and the planned LNG terminal. And the Corps and National Marine Fisheries Service ("Service") arbitrarily minimized the risk of dredging to threatened corals despite a recent catastrophic event in Miami—where (as here) Defendants insisted impacts would be insignificant only to concede, after-the-fact, that devastating damage had occurred.

In response, Defendants rely extensively on post-decision developments and justifications, attempting to paper over their inadequate analyses. Defendants oddly highlight the 2019 LNG terminal construction to somehow excuse their failure to consider the reasonably foreseeable conversion to LNG in the 2018 Assessment. Defendants admit this terminal was constructed without the required federal

authorization and NEPA analysis. Def. Br. 18. Therefore, far from undercutting Plaintiffs' NEPA claim, this post-decision development (if considered by the Court) only reinforces that the Assessment should be remanded for consideration of the environmental impacts of the anticipated LNG development in the Harbor.

Similarly, the Corps attempted to correct its faulty environmental justice analysis by publishing a map in 2023 identifying environmental justice communities next to the LNG terminal's channel. Def. Br. 17. And in 2022, the Service reviewed a study documenting its failure to anticipate the extensive coral death and habitat destruction from dredging in Miami but then arbitrarily declared it "extremely unlikely" that the San Juan Harbor dredging project would cause *any* adverse effects. Def. Br. 19. These post-hoc rationalizations should be viewed with skepticism. They also fundamentally undermine NEPA's requirement that "environmental information [be made] available to public officials and citizens *before decisions are made*," 40 C.F.R. § 1500.1(b) (emphasis added), and the ESA's mandate to use the best available science. 16 U.S.C. § 1536(a)(2).

## ARGUMENT

## I.    The Corps failed to consider reasonably foreseeable LNG development as a "connected action," "cumulative impact," and/or "indirect effect."

NEPA sets forth separate, distinct requirements for considering (1) "connected actions" together, thereby avoiding segmentation, 40 C.F.R. § 1508.25(a)(1), (2) the overall "cumulative impacts" of a proposal in addition to

past, present, and future actions, *id*. § 1508.7, and (3) a proposal's "indirect effects," *id*. § 1508.8(b). It is undisputed that while the Corps was preparing the Assessment, the Authority repeatedly notified the Corps it was proceeding with LNG import terminal development in the Harbor, and that the dredging was necessary for this development. *See*, *e.g*., JA328-31. The Corps identified this need to provide LNG tankers access to the Authority's LNG terminal as a primary purpose of the dredging project, JA95-96, and recognized this LNG development as a "reasonable future assumption." JA191. Whether characterized as a connected action, a reasonably foreseeable project that must be included in the cumulative impacts analysis, or a reasonably foreseeable indirect effect of the dredging project, the Corps was required to consider the environmental consequences of this planned LNG terminal construction and operation in the Assessment. Its failure to do so violated NEPA.

A.    The Corps was sufficiently on notice that the dredging project and planned LNG development in the Harbor were connected actions

Agencies must consider "connected actions" together in the same environmental assessment, and actions are "connected" if they "cannot or will not proceed unless other actions are taken previously or simultaneously." El Puente Br. 12-13. The record demonstrates the Authority was planning LNG development in the Harbor at the same time as the dredging project, and that it repeatedly told the Corps this development could not proceed without the dredging. *Id*. at 13-15.

3

Thus, the dredging and LNG development are connected actions that the Corps should have considered together.

Defendants wrongly assert that El Puente forfeited this claim. Def. Br. 23. First, Ruth Santiago, representing environmental and community groups, spoke at the public hearing for the project and followed up by providing "some of the documents [she] mentioned concerning LNG deliveries to Puerto Rico." JA617, JA449. Ms. Santiago therefore put the Corps on notice of LNG development in the context of the dredging project in San Juan Harbor.

In any case, the Corps "bears the primary responsibility to ensure that it complies with NEPA," and "an [assessment's] . . . flaws might be so obvious that there is no need for a commentator to point them out specifically[.]" *Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004). Here, the Authority made clear to the Corps throughout the NEPA process that its plan to convert the power plants in the Harbor to LNG was dependent on the dredging project. El Puente Br. 13-15. Indeed, the project's purpose is to allow the import of LNG on large tankers into the Harbor. JA95-96.

Thus, even if the issue had not been raised in a public hearing or comments, it should have been readily apparent to the Corps that its Assessment must address this related action. As the Authority emphasized to the Corps, the dredging project "is of outmost importance and hence required" for the LNG project to proceed.

4

JA411;  *see also CTIA-The Wireless Ass'n v. FCC*, 466 F.3d 105, 117 (D.C. Cir. 2006) (rejecting an exhaustion defense where the agency "had an opportunity to consider the identical issues presented to the court but which were raised by other parties").[1]

### B.     The Corps was required to consider the dredging project and LNG development as connected actions when it prepared the Assessment

Defendants inappropriately focus on the *current status* of LNG development in the Harbor rather than the Authority's plans during the NEPA process for the project. Def. Br. 17-18, 28-29. The Court's review must be based on the record before the agency at the time it made its decision. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). While the Corps was preparing the Assessment, the Authority notified the Corps it was submitting its permit application for the LNG terminal to FERC. JA328. The Authority provided a

---

[1] The fact that LNG development is a key purpose of the project distinguishes this case from those relied on by Defendants. In *Sierra Club v. FERC*, 827 F.3d 36, 50-51 (D.C. Cir. 2016), the narrow issue was whether the agency was required to quantify emissions "in pounds per megawatt-hour instead of in tons per year." And in *Center for Sustainable Economy v. Jewell*, 779 F.3d 588, 601 (D.C. Cir. 2015), the issue was whether the agency's "cost-benefit methodology" adequately quantified the impacts of additional oil and gas leasing. Neither case involved an agency's wholesale failure to consider the impacts of a connected, reasonably foreseeable development that was a central justification for the action under review.

timeline showing LNG development would parallel the dredging project. JA330, JA157.[2]

Defendants cite to *Sierra Club v. U.S. Army Corps of Engineers,* 803 F.3d 31 (D.C. Cir. 2015), where plaintiffs argued that portions of a pipeline not subject to federal control should have been included in the NEPA analysis. Def. Br. 27. The Court found, however, that the point of the connected actions doctrine "is to *prevent the government*" from segmenting *federal actions* into separate projects. *Sierra Club*, 803 F.3d at 49-50 (emphasis added). Here, the Corps was notified that FERC would be considering a proposal for LNG development in the Harbor concurrently with the dredging project. JA328-30. The government, however, not only segmented these two projects, but the Corps ignored the environmental consequences of the LNG development in the Assessment.

Defendants also rely on *National Wildlife Federation v. FERC*, 912 F.2d 1471 (D.C. Cir. 1990). Def. Br. 27-28. At issue was FERC's consideration of the initial phase of a hydro project (Phase I) and potential later expansion (Phase II). *Nat'l Wildlife Fed'n*, 912 F.2d at 1473. Significantly, due to concerns raised during the administrative process, the project proponent "specifically withdrew [its]

---

[2] Notably, for the post-decision LNG project Defendants identify, New Fortress Energy failed to seek the required FERC approval, thereby avoiding NEPA review prior to construction (Def. Br. 18), further highlighting why the Corps should have considered the dredging and expected LNG development together in the Assessment.

request for approval of its Phase II plans." *Id*. at 1474. Moreover, the record was clear that due to environmental concerns, Phase II "might not be approved in a later proceeding." *Id*. at 1477. The Court therefore held that FERC "was not required to more thoroughly evaluate the possible effects of Phase II" in the Phase I analysis. *Id*. Here, in contrast, while the Corps was preparing the Assessment, it understood that LNG development was proceeding simultaneously and was never informed that the LNG project would not occur. As a result, the Corps took the project's purported economic benefits into account in approving the dredging, JA184, yet never considered its environmental impacts.[3]

C. The Corps failed to consider the cumulative impacts of all past, present, and reasonably foreseeable future actions in the Assessment

A cumulative impacts analysis must identify:

(1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

---

[3] Within the "segmentation" section of their brief, Defendants conflate "cumulative *actions*," 40 C.F.R. § 1508.25 (emphasis added), with the Corps' distinct obligation under NEPA to consider all "cumulative impacts" and "indirect effects" relating to the dredging project. *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 999 (9th Cir. 2004) (explaining the difference). El Puente has not argued that the LNG project is a "cumulative action," and thus Defendants' briefing addressing that issue should be disregarded. Def. Br. 31-32.

El Puente Br. 18, *quoting Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1319

(D.C. Cir. 2014). Like the Corps' Assessment, Defendants' response fails to reckon

with this test.

First, in response to the Corps' failure to identify the appropriate area,

Defendants cite to the study area for the Assessment more generally. Def. Br. 34,

*citing* JA96. However, this Court has recognized that a project's cumulative

impacts may affect a broader area than its direct and indirect effects, as evidenced

by the Court's requirement that a cumulative impacts analysis separately identify

the area affected by a project's cumulative impacts. *Del. Riverkeeper*, 753 F.3d at

1319. The Corps failed to do so for the dredging project.

Second, in response to the Corps' failure to identify all past, present, and

reasonably foreseeable future actions, Defendants point to the Corps' discussion of

baseline conditions, and claim the Corps analyzed *existing* conditions. Def. Br. 35.

But this similarly ignores critical elements of this Court's test. If considering

existing conditions is all that is required, there would have been no need for the

Court to specify that the cumulative impacts analysis *must identify* the relevant

"reasonably foreseeable" actions *as well as* "past" and "present" actions. *Del.*

*Riverkeeper*, 753 F.3d at 1319.

Defendants further argue that El Puente did not "identify a single additional

project" the Corps overlooked. Def. Br. 36. NEPA, however, places the cumulative

8

impacts requirement on the Corps, not El Puente. *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 608 F.3d 592, 605 (9th Cir. 2010); *see also Humane Soc'y of the U.S. v. Dept. of Com.*, 432 F. Supp. 2d 4, 22 (D.D.C. 2006) ("As [the agency] did not fulfill its obligation . . . it is not relevant whether plaintiffs have identified potential impacts that should have been included.").

Regardless, as explained, the Corps failed to include the Authority's planned LNG development, even though the Corps admitted it was "a reasonable future assumption." JA191. As recognized by the Ninth Circuit, "[b]oth connected actions and unrelated, but reasonably foreseeable, future actions may result in cumulative impacts." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988). Moreover, a project need not be finalized to be reasonably foreseeable. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010). Rather, in determining what effects are reasonably foreseeable, "an agency must engage in reasonable forecasting and speculation." *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1178 (D.C. Cir. 2023) (citations omitted). Whether or not the LNG development satisfies the test for connected actions, it undoubtedly satisfies the test for a reasonably foreseeable project that the Corps was required to consider in the cumulative impacts analysis.

Defendants argue the effects of the dredging and LNG development will not overlap in time. Def. Br. 31-32. This, however, again ignores the information

before the Corps *when it prepared the Assessment*. At that time, the Authority scheduled construction of LNG development from 2021-24, JA330, while the Corps planned dredging construction for 2023. JA70.

The Corps also failed to consider the project that Defendants highlight in their brief: the New Fortress Energy LNG facility. Def. Br. 17-18. In 2017, during the dredging project's NEPA process, New Fortress provided a "letter of intent" for its project to the Coast Guard, during its consideration of the safety zone for LNG tankers. JA1301-04. It was therefore reasonably foreseeable but not considered in the Assessment's cumulative impacts analysis. In fact, this facility has entirely evaded NEPA review.

Defendants also argue the resources in the study area are "at little risk of being cumulatively impacted." Def. Br. 36. As explained, this puts the cart before the horse; it is not possible to engage in a meaningful cumulative effects analysis without first identifying the past, present, and reasonably foreseeable actions that may collectively impact the environment in the identified area. El Puente Br. 20. El Puente has in fact identified resources that could be significantly impacted: nearby environmental justice communities and threatened corals. Moreover, even if the Corps expected the impacts of the dredging itself to be minor, NEPA recognizes that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

D.    <u>The Corps failed to consider the indirect effects of LNG development</u>

Because the Corps recognized that LNG development was a reasonably foreseeable result of the dredging, it should also have considered this development as an "indirect" effect of the project. El Puente Br. 24, *citing* 40 C.F.R. § 1508.8(b). Defendants' argument that this development was not reasonably foreseeable ignores the Corps' contrary finding in the Assessment (JA191), that LNG development was a purpose of the project (JA95-96), and that the Corps considered the economic benefits of the LNG development (JA184).

The Corps cannot shirk its responsibility to include LNG development as an indirect effect "on the ground that it lacks authority to prevent, control, or mitigate those developments." *Eagle Cnty.*, 82 F.4th at 1180. Defendants' attempt to distinguish *Eagle County* is unpersuasive. Def. Br. 33-34. The railway's purpose in *Eagle County* was to transport oil to Gulf Coast refineries. While the agency did not know which specific refineries, the Court held the agency failed to explain why it could not employ "some degree of forecasting" to identify the anticipated impacts in the Gulf region. *Eagle Cnty.*, 82 F.4th at 1179. Here, the Corps was similarly required to engage in reasonable forecasting of the impacts of LNG development expected to result from the project but failed to do so. Indeed, the facts are more egregious here, as the Corps knew the precise location of this development. JA332, JA333 (maps showing LNG project's location).

11

II.    **The Corps cannot cure its faulty environmental justice analysis with a post-hoc analysis.**

The Corps' environmental justice analysis failed to consider impacts to communities near the dredging activity. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021). The Assessment admits that dredging could affect communities around the Harbor, JA225, but its analysis did not include most of those communities.

Rather than defend the Assessment, Defendants argue they mooted this deficiency with an analysis completed *after* this lawsuit was filed. Def. Br. 38. The Corps' post-decision 2023 environmental justice analysis cannot cure the NEPA violation. *Metcalf v. Daley*, 214 F.3d 1135, 1143, 1146 (9th Cir. 2000) (setting aside assessment that post-dated action under review).

Plus, the 2023 supplemental environmental assessment was irrelevant to the 2018 decision; it "only evaluates the dredging of a *newly proposed* sand source outside the Federal Channel limits," which the Corps abandoned. JA1128 (emphasis added). Acceptance of this after-the-fact analysis for the dredging project would gut the purpose of NEPA. The environmental justice analysis's purpose, like all NEPA analyses, "is to identify and analyze issues to inform the

12

decision-making process for Corps decision makers and the public."[4] That process and the resulting Assessment concluded in 2018.

Preparing the environmental justice analysis long after the Corps' decision and during litigation is "fatally defective" because the Corps was already predisposed to finding no disproportionately adverse impacts on disadvantaged communities. *See Metcalf*, 214 F.3d at 1146. Thus, the issue is not moot, and the Court should remand the Assessment to the Corps to objectively evaluate the environmental justice impacts. *Id.*

The two cases the Corps cites are inapplicable. First, *Better Government Association v. Department of State* concerned a Freedom of Information Act fee waiver request. 780 F.2d 86, 91 (D.C. Cir. 1986). Once the request was granted, the claim was moot only "*as applied to their specific fee waiver requests.*" *Id.* In contrast, the Corps' post-hoc exercise does not moot the controversy over whether the agency's previous *decision* was informed by a hard look at environmental justice. *Sierra Club v. Watkins* is also inapposite because, there, the agency made a new decision once the earlier action was partially complete. *See* 808 F. Supp. 852,

---

[4] Memorandum from Scott A. Spellmon, Lieutenant General, Army Corps (Aug. 31, 2021) (hereafter, "Spellmon Memorandum"), https://planning.erdc.dren.mil/toolbox/library/MemosandLetters/EJAnOverviewMemo_31Aug2021.pdf. The Court may take judicial notice of the Spellmon Memorandum because it is a public record with contents that cannot reasonably be disputed. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 303 (D.C. Cir. 2023).

857, 876 (D.D.C. 1991). Here, the dredging has not even commenced, and the Corps invokes a post-hoc 2023 analysis to support a 2018 decision the agency never revisited.

If the Corps genuinely wanted to address its deficient environmental justice analysis, it could request a voluntarily remand of its 2018 decision, pause the project, and redo the analysis with meaningful public input. Having failed to do this, the Corps cannot argue that a post-hoc analysis moots El Puente's claim.

The Corps not only failed to identify overburdened communities, but also failed to provide opportunities for meaningful involvement. *See* Spellmon Memorandum 2. Defendants say the Corps "offered to provide, on request" Spanish translation of a portion of the draft assessment, Def. Br. 40, but a mere offer to provide a Spanish translation does not provide meaningful involvement. For example, no Spanish translation of the public hearing presentation exists, despite the Corps staff promising "I can provide that to you." JA617 (responding to Ruth Santiago, attorney representing local organizations).

Defendants do not dispute hurricanes left much of Puerto Rico without electricity, cell service, or passable roads. Hurricane damage severely disrupted the ability of interested parties to comment or participate in the process. Nor do Defendants dispute that the Corps, despite receiving an "inquir[y] as to whether the comment period would be extended due to the calamitous circumstances," never

did so. Def. Br. 40. Instead, Defendants thread a distinction between "inquir[ing] whether" there would be an extension and "request[ing]" one. *Id*. That position, and the Corps' underlying conduct, is hardly indicative of an agency genuinely interested in facilitating public involvement.

## III.    Defendants failed to adequately consider impacts to threatened coral.

Defendants' inadequate analysis of the dredging project's impacts to threatened corals violated both NEPA and the ESA. Defendants fail to address many of the deficiencies identified in El Puente's opening brief, instead relying on the deference afforded to agencies on matters of scientific concern. But bedrock administrative law requires courts to carefully review agency decisions and ensure the agency examined relevant information and articulated a "rational connection between the facts found and the choice made." El Puente Br. 11-12 (citation omitted). Such review is critical here, as Defendants are the same agencies that previously told the public that a dredging project in Miami would not harm corals, only to have that project kill hundreds of thousands of corals and jeopardize an entire ecosystem. JA1236. Like in Miami, Defendants provided assurances without the requisite analysis that NEPA and the ESA require.

A.    The Corps' Environmental Assessment violates NEPA

Defendants' assurance that the Corps took a hard look at impacts to corals as required by NEPA is belied by the record.

    1.     *The Corps unlawfully made its finding without any data on corals at the mouth of San Juan Harbor*

First, Defendants do not address El Puente's claim that the Corps failed to evaluate sufficient baseline data regarding coral populations at the mouth of the Harbor head on, instead claiming the Corps evaluated *existing* baseline data. Def. Br. 41. But the existing data cannot inform the potential impacts to these corals because no surveys have ever been done in this area. The Assessment acknowledges that "ESA-listed corals may be found near the vessel disposal routes, particularly near the mouth of the [Harbor] and may be affected by sedimentation and turbidity associated with dredging and leakage from disposal vessels." JA1186. The Corps admits that it has not surveyed those areas and only plans to do so before dredging. *Id.*

Without information on coral abundance and location at the mouth of the Harbor, the Corps could not accurately evaluate the impacts of dredging and disposal on those corals. JA1192 (Service asking the Corps to identify "[t]he number and location of ESA-listed coral colonies within the harbor and adjacent to the mouth of the channel on both sides . . . in order to quantify potential impacts."). Just as this Court in *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016), found an agency's approval of offshore wind leases without adequate geophysical surveys violated NEPA, the Corps' approval of dredging without determining whether listed corals live along the vessel

16

disposal route is unlawful. *See also N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (finding post-approval surveys to locate listed plants unlawful). The Corps' proposal to "increase the risk of harm to the environment and then perform its studies . . . has the process exactly backwards." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733–34 (9th Cir. 2001).

> 2. *The Corps failed to take a hard look at the Miami dredging project*

Second, Defendants state they used a 150-meter indirect impact zone in their NEPA analysis because the best available science suggests that is where adverse dredging impacts are greatest. Def. Br. 42. But Defendants ignore the numerous scientific studies published before the Assessment showing the Miami project resulted in dredged materials migrating well beyond 150 meters from the dredging area, killing corals hundreds of meters away. *See*, *e.g.*, JA1236 (finding impacts to corals 700 meters from dredging). The only "conflicting report" suggesting the Miami project's impacts were limited to a 150-meter zone was a *monitoring program* that erroneously "concluded that the effects of dredging were minimal." JA1198. The very 2019 study that Defendants claim shows "conflicting reports" directly acknowledges that federal agencies knew Miami dredging impacts "were widespread, severe, and long-lasting." *Id.* The Corps knew that impacts would

17

extend beyond 150 meters yet analyzed this dredging project using that flawed metric anyways, violating NEPA.

To the extent the Corps relies on monitoring plans to ensure dredging plumes do not extend beyond the 150-meter indirect impact zone, the 2019 study Defendants cite explains that a nearly identical monitoring plan in Miami failed to detect dredging's harm to coral. JA1198, JA1210 (Miami monitoring program failed to detect conditions catastrophic to coral, including sediment plumes up to 10-15 kilometers from dredging); *see also* JA398 (monitors in Miami did not detect excessive turbidity). Defendants claim that "turbidity monitoring is not some new, untested practice," Def. Br. 46, but turbidity monitoring for a very recent Corps' project failed to detect conditions that caused a mass coral mortality event. The Corps' failure to apply the lessons from Miami and its outdated assumptions regarding the extent of dredging's harms and the efficacy of monitoring renders its Assessment invalid.

Defendants point to the 2022 "Memorandum to the File" that purports to distinguish San Juan from Miami. Def. Br. 43-44. Again, this blatant post-hoc rationalization cannot cure the flaws in the 2018 Assessment. *Overton Park*, 401 U.S. at 420. While Defendants claim the Corps prepared this Memorandum to determine whether to reinitiate ESA consultation, the agency did not write it until three years after the 2019 study that purportedly spurred its creation, and only after

El Puente filed this lawsuit. Post-decision documents created to buttress litigation positions are impermissible.[5]

B.     The Service's ESA determination is unlawful

The ESA's bar for formal consultation is low; *any* adverse effect on an ESA-listed species triggers formal consultation and preparation of a biological opinion. *Growth Energy v. EPA*, 5 F.4th 1, 30 (D.C. Cir. 2021). Defendants fail to explain how the record supports the Service's determination that this major dredging project is "not likely to adversely affect" threatened corals and how the mitigation measures it relies upon are sufficiently certain and binding.

1.     *The Service failed to provide a rational explanation for its "not likely to adversely affect" determination*

In 2017 the Service sent a letter to the Corps identifying deficiencies with the Corps' Biological Assessment, highlighting concerns grave enough that the Service was "unable to concur with the determination that the project is not likely to adversely affect ESA-listed corals and coral critical habitat." JA1189. Yet a year later the Service made a "not likely to adversely affect" determination, without explaining how their concerns were addressed. JA1185-88. Defendants allege the

---

[5] If this Court nonetheless considers the rationale offered in the 2022 Memorandum, the Memorandum fails to account for the fact that critical habitat is along the vessel disposal route, where it will be subject to leaking scows, and the silt and clay dredged material is precisely the type of "fine particles [that] will remain in suspension for much longer and therefore will be transported longer distances by prevailing sea currents than coarser sediments." JA1194.

concerns in the 2017 letter were not "authoritative agency policy" subject to an unlawful change in position. Def. Br. 48. But the Service must still reach a rational decision based on the record. El Puente Br. 11-12. Here, the Service failed to do so.

While the Corps and the Service met to discuss the Service's 2017 concerns (regarding in part the need for additional analysis to quantify turbidity impacts, and additional surveys at the mouth of the Harbor), there is nothing in the record indicating how the agencies resolved them and how the Service reached its determination. JA390-407. The Corps did not, as Defendants allege, modify its action "to ensure that the prediction of no adverse impacts remains correct." Def. Br. 48. In fact, the final project is substantially similar to that contained within the Corps' Biological Assessment that prompted the Service's conclusion that it could not concur with a "not likely to adversely affect" determination. JA207, JA215-17, JA907-17. The Service was required to provide *some* explanation as to why the concerns underpinning its 2017 letter were no longer applicable. Its failure to do so violates the APA and ESA. *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 15 (D.D.C. 2014).

In addition, the ESA mandates the Service use the best available science in consultation. 16 U.S.C. § 1536(a)(2). The Service's "not likely to adversely affect" determination is contradicted by a large body of science indicating this project will harm listed corals and their habitat. *See*, *e.g.*, JA1213, JA1236.

Attempting to buttress the Service's determination, Defendants stress that no corals have been documented in the dredging areas. Def. Br. 48. But they ignore that no surveys of the Harbor mouth exist and that critical habitat is located directly adjacent to the vessel disposal routes. JA1186-87. Defendants claim maintenance dredging in the Harbor and dredging projects elsewhere have caused no documented adverse impacts, Def. Br. 48, while ignoring that maintenance projects are vastly smaller in scope. *See* JA180. And Defendants claim scow transport vessels are subject to rigorous monitoring, Def. Br. 49, yet ignore reports showing such monitoring was ineffective at preventing conditions harmful to coral. JA1198. The Service cannot ignore evidence (including its own concerns in the record) cutting against its ultimate "not likely to adversely affect" determination.

> 2.    *The Service's monitoring and mitigation plan is inadequate as a matter of law*

Defendants argue the Service based its "not likely to adversely affect" determination on a "monitoring plan," not a "mitigation plan." However Defendants choose to label it, the Service's plan violates the ESA.

The Service's determination requires adaptive management measures—i.e. mitigation measures—to reach its "not likely to adversely affect" conclusion. The determination states, "[t]he monitoring plan will include *adaptive management measures* to be implemented to *mitigate* turbidity[.]" JA1187 (emphasis added). It continues, "*[w]ith the implementation of adaptive management measures …*

21

NMFS believes that effects to ESA listed corals will be discountable." *Id*. This monitoring plan, with its mitigation measures, was "*the basis*" for the Service's conclusion. *Id.* Thus, contrary to Defendants' suggestion that the monitoring plan was not required to avoid formal consultation, the plan (and hence its efficacy) was a necessary condition for the no adverse effects determination.

When, as here, mitigation measures are necessary to support an ESA consultation's conclusions, they must include "specific and binding plans" and "a clear, definite commitment of resources for future improvements" to implement those measures. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935-36 (9th Cir. 2008). Defendants admit they failed to "specify the exact measures" necessary to protect threatened corals. Def. Br. 47.

Instead, the Service plans to implement nebulous mitigation measures only when monitoring indicates the waters have reached 7 turbidity units above background. But scientific consensus is that damage to corals is already happening at 7 turbidity units above background; instead, the proper threshold to protect corals is 7 turbidity units *absolute*. JA1186 (finding the maximum allowable turbidity in corals reefs during short-term construction events should be 7 turbidity units or less). As the Service itself has recognized, corals living in naturally turbid conditions, like those just outside the Harbor, are "living at or near their threshold for turbidity and sedimentation," and any additional disturbance "would have

22

greater impacts to these corals than those in a more pristine environment." JA1195.

Given that (1) mitigation measures would not even begin until 7 turbidity units

above background and (2) these corals are already living in relatively turbid

waters, mitigation will only occur after turbidity is so high that damage to corals is

already occurring.

Defendants do not, and cannot, offer any meaningful retort to the

voluminous caselaw requiring mitigation measures be specific and binding under

the ESA. *See*, *e.g.*, *Ctr. for Biological Diversity v. Bernhart*, 982 F.3d 723, 747 (9th

Cir. 2020). Defendants' reliance on *Center for Biological Diversity v. Bureau of

Land Management*, 698 F.3d 1101, 1114-15 (9th Cir. 2012), is misplaced. There,

the Ninth Circuit found that only *specific* mitigation measures identified in an

action under consultation are binding and enforceable. Here, the Corps'

commitment to implement its plan is not binding because the monitoring plan and

its mitigation measures are undefined and are therefore not included in the

dredging project. The other cases Defendants cite only analyze mitigation

measures under NEPA, not the ESA. Def. Br. 45-47.[6]

---

[6] To the extent Defendants use these cases to support their use of undefined
mitigation measures under NEPA, this argument also fails. For example, the
mitigation plan here is far less developed than in *Theodore Roosevelt*, where the
adaptive management plan had a "thirteen-page list of specific protective
measures" to augment "relatively detailed mitigation measures." 616 F.3d at 516.

Given that Defendants were responsible for killing hundreds of thousands of corals in Miami with a similar plan to monitor and mitigate turbidity, their lack of concrete and specific mitigation measures offers little assurance that imperiled corals will emerge from this project unharmed.

## CONCLUSION

The Court should vacate and remand the Corps' Environmental Assessment and Finding of No Significant Impact and the Service's not likely to adversely affect determination.

Dated: November 20, 2023                Respectfully submitted,

                                        /s/ *Catherine Kilduff*
                                        Catherine Kilduff (D.C. Cir. Bar. No. 64754)
                                        Emily Jeffers (D.C. Cir. Bar. No. 64779)
                                        Center for Biological Diversity
                                        1212 Broadway, Suite 800
                                        Oakland, CA 94612
                                        (510) 844-7100
                                        ckilduff@biologicaldiversity.org
                                        ejeffers@biologicaldiversity.org

                                        Marc Fink (D.C. Cir. Bar No. 64776)
                                        Center for Biological Diversity
                                        209 East 7th St
                                        Duluth, MN 55805
                                        (218) 464-0539
                                        mfink@biologicaldiversity.org

                                        *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify this brief complies with the type-volume limitation of Rule 32(a)(7) of the Federal Rules of Appellate Procedure and the Order of this Court dated September 12, 2023 (Doc No. 2016401). As measured by the word-processing system used to prepare this reply brief, the brief contains 5,497 words. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point, proportionally spaced, Roman-style typeface (Times New Roman).

Dated: November 20, 2023

/s/ *Catherine Kilduff*
Catherine Kilduff


## CERTIFICATE OF SERVICE

I certify that on November 20, 2023, I served the foregoing Reply Brief of Petitioners-Appellants on all registered counsel through the Court's electronic filing system (ECF).

Dated: November 20, 2023

/s/ *Catherine Kilduff*
Catherine Kilduff